[L. A. No. 20189. In Bank. Mar. 11, 1949.]

AUSTIN CARTER, Appellant, v. SEABOARD FINANCE COMPANY (a Corporation), Respondent.

A. W. Brunton and Lauren M. Handley for Appellant.

Ralph C. Dills and James G. Butler as Amici Curiae on behalf of Appellant.

Bromley, Ritter & Lindersmith and H. E. Lindersmith for Respondent.

O'Melveny & Myers, Louis W. Myers, Sheppard, Mullin, Richter & Balthis, George R. Richter, Jr., and Brobeck, Phleger & Harrison as Amici Curiae on behalf of Respondent.

Fred N. Howser, Attorney General, Edward Sumner and B. Abbott Goldberg, Deputy Attorneys General, Cross & Brandt, R. H. Cross, Francis L. Cross, David B. Gideon, Robert C. Hayes, Alex Sherriffs, Robert E. Stone and Alfred F. Breslauer as Amici Curiae.

SHENK, J.—This is an appeal by the plaintiff from a judgment for the defendant on three causes of action attacking the validity of a transaction for the purchase of two trucks and two trailers.

In 1946, the plaintiff and a former business associate Spurgeon decided to engage in the trucking business. The plaintiff negotiated with Brace, local truck manager for the defendant finance company. On March 11, 1946, he entered into the transaction with the defendant by which he acquired a GMC truck and Weber trailer and a Sterling truck and Fruehauf trailer, and executed to the defendant a note and mortgage covering the purchase price and other items.

The defendant had previously repossessed the Sterling truck and Fruehauf trailer under the terms of a chattel mortgage held by it after the mortgagor Houston had defaulted. The defendant had given Houston five days' notice of its election to sell as required by the terms of the mortgage.

The Weber trailer was owned by Northern Transportation Company and the GMC truck by one Moose, subject to a chattel mortgage held by the Bank of America.

The total purchase price including items for registration fees, insurance premiums, tires and certain repairs was $20,-358.41. The plaintiff made a down payment of $4,700 to the defendant and executed a promissory note for $15,658.41 and a chattel mortgage on all four vehicles as security for the balance. The principal was to be repaid in 17 monthly installments of $1,000 which were to include charges at the rate of 1½ per cent per month on the unpaid principal and a final installment covering any unpaid balances.

Under the terms of a "Statement of Loan" executed at the same time, the defendant was directed to disburse the amount of the loan plus the cash received. The defendant did so disburse the amounts as follows: (1) $7,685.72 to defendant in satisfaction of the Houston mortgage on the Sterling and

Fruehauf; (2) $1,947.50 to Northern Transportation Company for the Weber; (3) $6,918.75 to the Bank of America for release of the GMC from the Moose chattel mortgage; (4) $3,806.44 to various other persons and the Department of Motor Vehicles for sales taxes, repairs, insurance, and fees.

Subsequently additional disbursements for tires, insurance and repairs were made by the defendant at the plaintiff's request increasing the principal sum to $18,955.74. Payments in varying amounts totalling $1,776.23 had been made when at the beginning of July, 1946, Spurgeon notified Brace that neither he nor the plaintiff could make the payments. He followed Brace's instructions to deliver the equipment to a dealer's lot. When Brace gave the plaintiff notice that the equipment would be sold unless within five days the plaintiff paid the entire unpaid balance, the plaintiff commenced the present action.

The first cause of action charges that Brace, defendant's agent, fraudulently misrepresented that the Sterling truck was in good mechanical condition whereas shortly after plaintiff took possession he learned that the motor was not suitable for the operation of the truck. The alleged fraud is predicated upon the following contentions: (1) that Brace made express representations as to the condition of the truck; (2) that Brace fraudulently concealed from the plaintiff the fact that the Sterling had been involved in a wreck only a short time before; and (3) that the serial number of the motor had been changed to make it appear to be a later model.

Ample evidence was offered which supports the judgment for the defendant on the first cause of action. There was testimony that the only statement of Brace as to the truck's condition was that "it should be in good condition" in view of the fact that the defendant had recently spent nearly $3,000 in having it repaired. This was merely Brace's opinion, based upon his expenditures for repairs, and did not form a basis for a cause of action.

Nor did the failure of Brace to inform the plaintiff that the truck had been in a wreck charge the defendant with fraud, for, in the absence of a fiduciary relationship, the defendant was not bound to volunteer that information. (Rest., Contracts, § 472.) Furthermore, the $3,000 repair bill listing items which indicated that major repairs had been made on the truck should have placed Carter on inquiry as to the reason therefor.

No evidence was offered to prove that Brace knew of the change in the serial number, that the change was not permitted by the Motor Vehicle Department, or that the plaintiff relied upon the serial number in deciding to purchase. It appears that the discrepancy between the number and motor model was not discovered until a month after the sale was consummated.

There was no evidence of reliance upon any representations of the defendant's agent. The plaintiff had formerly engaged in the trucking business and was familiar with trucks and motors. Before consummating the transaction he inspected the truck several times and drove it for about half an hour. He took the further precaution of calling in a mechanic who had previously worked on the motor and who advised him that it was all right. Where the plaintiff does not rely upon the statements of fact or opinion made by the defendant but instead makes an independent examination which satisfies him, no actionable fraud is shown. (*Nielsen* v. *McKenna,* 8 Cal.2d 690 [67 P.2d 1044]; *Yates* v. *Eudemiller,* 213 Cal. 26 [1 P.2d 434].) The findings and judgment as to the first cause of action are supported by the evidence.

The second cause of action is based upon alleged violations of section 2981 and 2982 of the Civil Code added in 1945 (Stats. 1945, ch. 1030, p. 1991) regulating conditional sales of motor vehicles. By section 2981(a) a conditional sale contract is defined as:

"1. Any contract for the sale of a motor vehicle, with or without accessories, under which possession is delivered to the buyer but the title vests in the buyer thereafter only upon the payment of all or part of the price, or upon the performance of any other condition. . . .

"3. Any contract for the sale of a motor vehicle, with or without accessories, under which possession is delivered to the buyer, and a lien on the property is to vest in the seller as security for the payment of part or all of the price, or for the performance of any other condition."

Subdivision (b) of section 2981 defines "seller" as "the person who sells or leases the property under a conditional sale contract."

Subdivision (h) declares the "time price differential" to be "any amount which the buyer agrees to pay to the seller in excess of the unpaid balance" which is defined in subdivision (g) as the difference between the cash price and down

payment plus insurance premiums and fees paid public officers.

Section 2982(a) requires that every contract of conditional sale shall recite the cash sale price, the buyer's down payment and whether made in cash or by trade-in, the amount of the cash price, the cost to the buyer of insurance, an itemization of fees to be paid by the seller or buyer to any public officer, the amount of the unpaid balance, the time price differential, the contract balance, and the number, amount and due date of installment payments.

It is further provided in section 2982 that "(c) The amount of the time price differential in any conditional sale contract for the sale of a motor vehicle, with or without accessories, shall not exceed 1 per cent of the unpaid balance multiplied by the number of months, including any excess fraction thereof as one month, elapsing between the date of such contract and the due date of the last installment, or twenty-five dollars ($25), whichever is greater, provided that such contract may provide for interest on any delinquent installment from and after the date of delinquency, and for reasonable collection costs and fees in the event of delinquency. If the seller, except as a result of an accidental and bona fide error in computation, shall violate any provision of this subsection (c), the conditional sale contract shall not be enforceable except by a purchaser for value, and the buyer may recover from the seller in a civil action three times the total amount paid on the contract balance by the buyer to the seller or his assignee pursuant to the terms of such contract."

It is contended that section 2981(a) 3 discloses a legislative purpose to include in the definition of a "conditional sale contract" those transactions which are conventionally regarded as chattel mortgages in order to thwart evasions of the act by the use of the chattel mortgage form rather than the conditional sale contract. The phrasing of the section appears to support the contention, and the statute should be held to apply to transactions where a chattel mortgage is taken by a seller of a motor vehicle. The present case then presents the problem whether, in exercising its power of sale after repossessing the Sterling truck and Fruehauf trailer under the terms of the Houston mortgage, the defendant was a "seller" within the meaning of the conditional sale act.

It is undoubtedly true that a "seller" need not be the owner of the property sold. Since this defendant had the power to make a binding sale which would pass title to the

Sterling and Fruehauf to the plaintiff it may be said to be a seller of those two vehicles within the meaning of the act, despite the fact that it had only a lien on the vehicles. Its interest was tantamount to complete ownership as far as its power to deal with the vehicles was concerned. Houston the mortgagor was not involved. He received no money, did not participate in the sale and had no knowledge of or any apparent interest in the transaction. The defendant's agent Brace handled it and made all necessary arrangements.

The plaintiff contends that he was also entitled to regard the defendant as seller of the Weber and GMC because, so it is claimed, the defendant was an undisclosed agent in the sale. The evidence clearly points to the conclusion impliedly reached by the trial court that the defendant was neither agent nor principal in the sale of that truck and trailer, but merely financed the purchase thereof by the plaintiff.

The plaintiff contends that the contract charge of 1½ per cent per month was more than the maximum time price differential allowed by section 2982(c). However, he concedes that if he had paid all of the installments when due the time price differential would have amounted to $2,480.22 on the initial balance of $15,658.41. Under section 2982(c) the time price differential may not exceed 1 per cent of the unpaid balance multiplied by the number of months, including any excess fraction thereof as one month, elapsing between the date of the contract and the due date of the last installment. The period from March 11, 1946, the date of the contract, to September 22, 1947, the due date of the last installment, spanned 18 months, 11 days. Permissible charges are to be computed on the basis of 19 months. The allowable time price differential would therefore be $2,975.10, a sum greater than that called for by the contract. The plaintiff's assertions of violation of this subdivision are without merit.

Although the defendant has not exceeded the charge limitation of section 2982(c), it is apparent that it has not complied with the form and requisites of conditional sale contracts set forth in section 2982(a). The contract did not recite the full cash price of each of the trucks and trailers, nor the amount of the down payment credited toward each, the total cost of insurance to the buyer, itemization of fees to be paid to the Motor Vehicle Department, the correct time price differential, nor the amount of the final installment.

The effect of this failure to comply with the statutory requirements depends on whether the provisions are directory or mandatory. The obvious purpose of the statute is to protect purchasers of motor vehicles against excessive charges by requiring full disclosure of all items of cost. If the statute be construed as mandatory the contract was unenforceable with respect to the Sterling and Fruehauf, for the reason that it was in violation of the statute. This is so notwithstanding the fact that the statute does not expressly pronounce it so. (Civ. Code, § 1667(2); *Smith* v. *Bach,* 183 Cal. 259 [191 P. 14]; *Levinson* v. *Boas,* 150 Cal. 185 [88 P. 825, 11 Ann.Cas. 661, 12 L.R.A.N.S. 575]; *Kreamer* v. *Earl,* 91 Cal. 112 [27 P. 735]; *Jacks* v. *Taylor,* 24 Cal.App. 667 [142 P. 121]; 50 Am. Jur. § 20, p. 42.)

Whether the statute was meant to be mandatory or directory may not be determined merely from the fact that it provided that certain formalities "shall" be followed. The word "shall" in a statute may sometimes be directory only, whereas the word "may," seemingly much less forceful, may be mandatory. (*Pulcifer* v. *County of Alameda,* 29 Cal.2d 258, 262 [175 P.2d 1]; *Estate of Mitchell,* 20 Cal.2d 48 [123 P.2d 503].) The entire statute may be resorted to in order to ascertain its proper meaning. If to construe it as directory would render it ineffective and meaningless it should not receive that construction. To so construe it would indicate that the prescribed form and requisites are merely desirable matter which the seller could include or would not be bound to include, at his option. Such a construction certainly would not afford the protection to purchasers which was intended. The form and requisites must therefore be held to be required and the statute in these respects to be mandatory.

The defendant contends that the result we reach wrongly considers a single chattel mortgage as two distinct instruments, a chattel mortgage not under the act (as to the GMC and Weber) and a conditional sale contract (as to the Sterling and Fruehauf). The answer is that a chattel mortgagee is required to follow the form demanded by the conditional sale act only when he sells the vehicle on which he takes a mortgage. The effect is to make this contract unenforceable only in part. (Civ. Code, § 1599.)

Since section 2982(c) limiting the time price differential provides that a contract in violation thereof shall be unenforceable and that the buyer may recover three times the amount paid by him on the contract balance, it follows that

the additional penalty applies to a violation of that subdivision only. The conclusion that a violation of other provisions renders the contract merely unenforceable is therefore not inconsistent.

On equitable grounds the plaintiff is not prevented from recovering the proportion of the payments applicable to the Sterling and Fruehauf. A member of the class for whose protection the statute was enacted is ordinarily not considered *in pari delicto* with those who violate the statute. (*McAllister* v. *Drapeau*, 14 Cal.2d 102, 112 [92 P.2d 911, 125 A.L.R. 800]; *Miller* v. *California Roofing Co.*, 55 Cal.App.2d 136, 143 [130 P.2d 740]; 3 Pomeroy's Equity Jurisprudence (5th ed. 1941) §§ 942, 942c, pp. 738, 745.)

The defendant was acting as a licensed personal property broker in respect to the loan secured by the chattel mortgage. It is therefore necessary to determine whether it was guilty of usury, as alleged in plaintiff's third cause of action in charging 1½ per cent per month on the unpaid balance of the loan.

The submission of this case was set aside at the request of amici curiae in behalf of the plaintiff. Upon reargument they have urged a reexamination of the usury law of this state to the end that the decisions of this court contrary to their contentions be overruled and that it be decided that the public officers charged with the duty of enforcing the law have, at least since 1934, been laboring under a misapprehension of its requirements, especially as applied to personal property brokers. Numerous other briefs amici curiae have been filed representing viewpoints both public and private on the question of usury.

In view of the course that the case has taken it is deemed advisable to review somewhat at length the statutory law and the decisions in this state on the subject. To discuss all of the points set forth in the briefs would take us far beyond the requirements of the case. Sufficient will be said to resolve the conflicting contentions presented by the parties and the friends of the court with reference to the issues in this particular case.

The practice of usury is of long standing. We find it condemned even in the ancient Holy Writings, "Neither shalt thou lay upon [my people] usury" (Exodus 22:25). When California assumed statehood it was a live question, some advocating that the law of Mexico limiting interest to 6 per cent per annum should be continued. (*Fowler* v. *Smith*,

2 Cal. 39; on rehearing 2 Cal. 569.) During the controversy the first session of the Legislature took notice of it and provided that it should be competent for persons to "agree in writing for the payment of any rate of interest whatever on money due or to become due on any contract;" and permitting the compounding of interest. (Stats. 1850, p. 92, §§ 2 and 3.) Thirty-eight years later this court said, "The illegality of usury is wholly the creature of legislation, and in this state nothing has been prescribed by the legislature to relieve parties from contracts providing for exorbitant rates of interest." (*Coleman* v. *Commins* (1888), 77 Cal. 548, 554 [20 P. 77].) In 1872, the Legislature enacted section 1918 of the Civil Code which contained in substance the provisions of the act of 1850. This remained the law generally until the adoption of the initiative usury law at the state election of November 5, 1918 (Stats. 1919, p. lxxxiii, hereinafter called the usury law). Thus, this state was without a general usury statute for the first 68 years of its existence. During that period the state had increased some 3600 per cent in population with a corresponding increase in business transactions and productivity; and although no general usury law was then in force acute problems of the necessitous borrower versus the rapacious money lender received frequent legislative treatment.

As early as 1861, the Legislature enacted a measure (Stats. 1861, p. 184) regulating the activities of pawnbrokers and limiting interest on loans of over $20 to 4 per cent per month in advance. This statute was held valid against the objection that it was not uniform in its operation as required by article I, section 11, of the state Constitution then in force. (*Jackson* v. *Shawl* (1865), 29 Cal. 267.) In 1881, section 340 of the Penal Code was enacted which provided that the rate of interest which might be received by pawnbrokers should not exceed 2 per cent per month. In 1885, this court held that this legislation was valid as against an objection that it violated section 25 of article IV of the Constitution which in effect prevented the Legislature from passing any special law regulating the rate of interest on money. It was declared that pawnbrokers were a sufficiently distinct class to justify a constitutional classification. (*Ex parte Lichtenstein,* 67 Cal. 359 [7 P. 728, 56 Am.Rep. 713].)

In 1905, two statutes were enacted one day apart. The first (Stats. 1905, p. 422) endeavored to regulate the interest and charges of loans secured by chattel mortgages on certain

classes of property and permitting an additional charge in connection with loans of $300 or less. The second (Stats. 1905, p. 711) provided for the incorporation of associations to loan money in sums not exceeding $300 on the security of personal property and also purported to limit rates and charges of lenders not incorporated under the act on loans of $300 or less. Both of these statutes were held unconstitutional. (*Ex parte Sohncke* (1905), 148 Cal. 262 [82 P. 956, 113 Am. St.Rep. 236, 7 Ann.Cas. 475, 2 L.R.A.N.S. 813].) In the light of that decision the Legislature in 1909 (Stats. 1909, p. 969; 2 Deering's Gen. Laws, Act 5825) attempted to regulate the business of making small loans secured by personal property. This was the first Personal Property Brokers Act. That statute defined a personal property broker as one engaged in the business of loaning money on the security of personal property the possession of which is retained by the borrower, or on the security of wages. That act permitted a maximum charge of 5 per cent per month on loans of this kind. A statute of 1911 (Stats. 1911, p. 978) reduced the rate to 2 per cent per month on loans covered by the statute of 1909. The Personal Property Brokers Act was attacked upon the same grounds urged successfully in *Ex parte Sohncke, supra,* 148 Cal. 262, but the statute was sustained as based on a reasonable classification. (*In the Matter of Application of Stephen* (1915), 170 Cal. 48 [148 P. 196, Ann.Cas. 1916E 617]; *Eaker* v. *Bryant* (1914), 24 Cal.App. 87 [140 P. 310].)

In 1917 (Stats. 1917, p. 658), the Legislature provided for the incorporation of industrial loan companies with authority to make loans on personal security or otherwise with certain restrictions and regulations.

The foregoing enactments do not constitute all of the laws passed by the Legislature in the period between statehood and the adoption of the usury law but a reference to them and others that might be mentioned serves to show that usury problems, especially as applied to small loans (which were quite uniformly considered as loans of $300 or less), were of frequent legislative cognizance. The usury law set a limit of 12 per cent per annum on all classes of loans and lenders. A portion of this statute which attempted to curtail charges of loan brokers was declared unconstitutional because it discriminated against certain groups of brokers, and because the subject was not included in the title. (*Wallace* v. *Zinman* (1927), 200 Cal. 585 [254 P. 946, 62 A.L.R. 1341].) Furthermore the statute did not prevent the lender himself from

making additional charges for services and expenses in connection with a loan. (*Haines* v. *Commercial Mortgage Co.* (1927), 200 Cal. 609, 616-617 [254 P. 956, 255 P. 805, 53 A.L.R. 725].) After the adoption of the usury law and during its operation the Legislature undoubtedly recognized the inadequacy, from a business and economic standpoint, of the fixed rate of 12 per cent per annum as applied to small loans and likewise concluded that the initiative measure was inadequate in that it did not prevent charges in addition to the interest which might be exacted from the borrower. The result was possible unconscionable and usurious interest and charges. Numerous attempts were made to change the rates of interest and to prescribe rates and regulations different from or inconsistent with the provisions of the usury law. Of particular significance was the adoption in 1931 (Stats. 1931, p. 558) of a law based on the Uniform Small Loan Law advocated by the Russell Sage Foundation which had been adopted in many states. The 1931 statute was a practical revision of the Personal Property Brokers Act of 1909. It established a comprehensive plan of regulation under the Commissioner of Corporations. Among other provisions it purported to permit personal property brokers to charge 3½ per cent per month on the unpaid balance of loans of $300 or less. This statute was held inoperative in *Beneficial Loan Society, Ltd.* v. *Haight,* 215 Cal. 506 [11 P.2d 857], on the ground that it constituted an attempt to amend or change the provisions of the usury law relating to interest and that such a revision could not be accomplished except by a vote of the people. The regulatory provisions of the 1931 act, however, were held not to be inconsistent with the usury law. (*In re Halck,* 215 Cal. 500 [11 P.2d 389].) These cases were decided in 1932.

The 1933 session of the Legislature submitted to the people of the state a proposed constitutional amendment known as Assembly Constitutional Amendment No. 79. At the same session the Personal Property Brokers Act was amended by striking out the invalid provisions relating to interest and by strengthening its regulatory features. (Stats. 1933, p. 1496.) Also at that session the Assembly appointed an Interim Committee to investigate "all problems in connection with the making of small loans" and to submit recommendations for legislation to the 1935 session of the Legislature.

The proposed constitutional amendment was adopted at the general election held November 6, 1934 (art. XX, § 22) the pertinent provisions of which are as follows:

"The rate of interest upon the loan or forbearance of any money, goods or things in action, or on accounts after demand or judgment rendered in any court of the State, shall be seven per cent per annum but it shall be competent for the parties to any loan or forbearance of any money, goods or things in action to contract in writing for a rate of interest not exceeding ten per cent per annum.

"No person, assocation, copartnership or corporation shall by charging any fee, bonus, commission, discount or other compensation receive from a borrower more than ten per cent per annum upon any loan or forbearance of any money, goods or things in action.

"However, none of the above restrictions shall apply to any building and loan association" or to industrial loan companies or to credit unions or to "any duly licensed pawnbroker or personal property broker," or to any bank operating under state or federal laws or to any nonprofit cooperative association or to any agricultural cooperative or to any corporations securing money or credit from any federal intermediate credit bank under the Agricultural Credits Act of 1923, "nor shall any such charge of any said exempted classes of persons be considered in any action or for any purpose as increasing or affecting or as connected with the rate of interest hereinbefore fixed. The Legislature may from time to time prescribe the maximum rate per annum of, or provide for the supervision, or the filing of a schedule of, or in any manner fix, regulate or limit, the fees, bonus, commissions, discounts or other compensation which all or any of the said exempted classes of persons may charge or receive from a borrower in connection with any loan or forbearance of any money, goods or things in action.

"The provisions of this section shall supersede all provisions of this Constitution and laws enacted thereunder in conflict therewith."

As stated it is the contention of the plaintiff, and by amici curiae in his behalf, that the defendant as a licensed personal property broker is guilty of usury with respect to the loan secured by the chattel mortgage as set forth in the third cause of action. It is their position that all of the lenders, including personal property brokers, specified in the third paragraph of the constitutional amendment as being exempt from the "above restrictions," are nevertheless subject to the 10 per cent overall limitation on interest referred to in the first paragraph until the Legislature sees fit to provide

a different interest rate under the power given it by the last sentence of the paragraph. The argument is that taken as a whole the amendment evidences an intention to confine the words "above restrictions" appearing in the first line of the third paragraph solely to the prohibitive language of the second paragraph; that they do not apply to limitations on interest laid down in the first paragraph, and that therefore the 10 per cent limitation applies even to exempt lenders as long as the Legislature has not established a different limitation to govern their class.

That the contention is without merit may be shown by the history attending the submission of the constitutional amendment to the voters of the state and by the judicial decisions on the subject. It may be said without question that the objective of the amendment was to abolish the inflexible, inadequate and unworkable provisions of the usury law and to reestablish in the Legislature the power to enact laws affecting the business of lending money in this state. This change could be brought about only by amending or repealing the usury law by vote of the people or by a constitutional amendment. The latter course was followed and as all statutes enacted either by the Legislature or under the reserved initiative power of the people must be in conformity with and be governed by the Constitution the amendment of 1934 became the supreme law of the state on the subjects to which it relates.

In determining its objectives the language of the amendment must be applied by the courts as it is written. In the case of uncertain or doubtful meaning recourse may be had to various methods for the determination of the purpose and intent of the framers and adopters of the law.

The language of the first and second paragraphs has no uncertain meaning. The first paragraph fixes the legal rate of interest upon loans at 7 per cent but authorizes agreements in writing calling for a rate of interest of not more than 10 per cent. This represents a change from the usury law only in that the authorized contract rate of interest was reduced from 12 to 10 per cent per annum. The unmistakable purpose of the second paragraph was to prevent lenders from circumventing the limits on interest established in the preceding paragraph by forbidding any charges whereby the borrower is required to pay more than the 10 per cent.

It is also clear that the limitations specified in both the first and second paragraphs fall within the general classification of "restrictions" as that word is used in the first line

of the third paragraph. The word "restrictions" is defined by Webster's New International Dictionary, as well as other standard authorities as "that which restricts; a limitation; a restraint; as restrictions on trade." We discover no good reason why the words "above restrictions" used in the third paragraph should not apply equally to both the first and second paragraphs. The rational construction of the language demands that they be read as applicable to both. (See *Wholesale Tobacco Dealers Bureau of Southern California, Inc.* v. *National Candy & Tobacco Co.*, 11 Cal.2d 634, 659 [82 P.2d 3, 118 A.L.R. 486].)

Furthermore the transfer to the Legislature of the power to legislate on the subject of rates of interest and charges of the exempted classes by the last sentence of the third paragraph is entirely inconsistent with the idea that the inflexible percentages fixed in the first paragraph are to be applied to the exempted classes. However, it is contended that a contrary intent is shown by the following language appearing at the end of the first sentence of the third paragraph after the enumeration of the exempted classes: "nor shall any such charge of any said exempted classes of persons be considered in any action or for any purpose as increasing or affecting or as connected with the rate of interest hereinbefore fixed." It is urged that this provision is evidence of an intention to exempt the special classes solely from the second paragraph's prohibition against added charges, and indicates that such charges are not to be considered in computing the interest received by those classes. It must be conceded that the purpose of the quoted language is ambiguous; but a less abstruse and more reasonable interpretation must be given to those words. It would seem not unlikely that their purpose was to assure that no charges which might in the future be established by the Legislature respecting any of the exempt classes, and that no charges made by exempt lenders prior to the establishment of charges by the Legislature, would affect or be connected with rates of interest fixed in the first and second paragraphs as to nonexempt lenders. It is quite certain that that language was not intended to so affect the specifically exempt classes as to make them subject to the overall percentage rates of the first paragraph.

In resolving the uncertainty caused by the inclusion of the last-quoted language of the third paragraph, recourse may be had, as an aid to interpretation, first to the summary prepared by the attorney general pursuant to his authority

and duty "to give a true and impartial statement of the purpose of the measure" (Pol. Code, § 797) and then to the arguments for and against the measure sent to the voters and set forth in the pamphlets accompanying the sample ballots and appearing immediately following the attorney general's summary. In this case there was no printed argument against the measure. The summary of the attorney general also appears on the ballot with a space to the right for a "Yes" or "No" vote (Elec. Code, § 3827). We find in this summary and in the argument what the electors of the state were told the proposed constitutional amendment was designed to accomplish. The complete text of the attorney general's summary as so included in the pamphlet and placed on the ballot is as follows:

"INTEREST RATES. Assembly Constitutional Amendment 79. Prescribes seven per cent per annum as interest rate upon loan or forbearance of money, goods or things in action, accounts after demand and judgments; permits written contract for rate not exceding ten per cent per annum, but forbids any charges whereby borrower pays over ten per cent. *Exempts from such restrictions building and loan associations, industrial loan companies, credit unions, pawnbrokers, personal property brokers, banks, and various non-profit cooperative associations, and others, of character therein mentioned. Permits Legislature to regulate said exempted classes, prescribe their maximum interest rate per annum and regulate their charges on loans.*"

The words which we have italicized are a clear and positive representation that the amendment if adopted would not fix the interest rates and charges for the exempted classes and would vest in the Legislature the power to regulate the business of those classes including the power to fix such rates of interest and charges. The summary and ballot statement appear to be a correct representation of the purposes of the measure.

The argument to the voters in favor of the proposed amendment—and as stated there was none against it—emphasized the fact that the inflexible provisions of the usury law of 1918 had been proved unsatisfactory as a curb on unscrupulous exactions of money lenders and that the specifically named exempted classes "have distinctive and individual problems peculiar to their respective classes of business. The needs of one are by no means common to all; each class meets with variable conditions and circumstances unlike those met by the others. An inflexible law, designed to embrace all of

them, is at once unjust and impractical. The Usury Law attempted to cover all classes, and has failed miserably.'' It was also stated that supervisory control of all of the exempted classes would be subject to the vigilant attention of the Legislature.

The Interim Committee appointed by the Assembly in 1933 to investigate the problems attending the regulation of the business of commercial loans and to recommend legislation made its report to the Legislature in 1935 (Assembly Journal, March 22, 1935, p. 1297) and recommended legislation. It reported that prior to the constitutional amendment of 1934 the Legislature was powerless to do anything to overcome such difficulties; that the Legislature had in 1933 submitted the constitutional amendment for the express purpose of giving to the Legislature the power to legislate as to the classes exempted from the general provisions of the amendment; that by virtue of this amendment the money lenders specifically named, including personal property brokers, are exempt from the maximum rate of interest therein fixed, and that the Legislature has the right to regulate their rates and charges.

The foregoing history is a demonstration that it was the purpose of the constitutional amendment of 1934 to free the Legislature from the restraints imposed by inflexible usury provisions so that interest and charges more appropriate to business conditions peculiar to each of the exempted classes could be established. Those who voted for the 1934 amendment had reason to expect that the exempt classes would not remain unregulated indefinitely. But until the Legislature exercises the power granted to it by the amendment to regulate the business of lenders in a manner appropriate to each exempted class, the class not so governed by legislation is subject to no restriction on interest rates or charges.

Likewise from the foregoing it was readily to be anticipated that this court would decide as it did in the case of *Matulich* v. *Marlo Investment Co.* in 1936 (7 Cal.2d 374 [60 P.2d 842]) that since the adoption of the constitutional amendment in 1934 there was ''no law of this state which limits the rate of interest which may be charged by personal property brokers.'' This holding was followed in 1937 in *Wolf* v. *Pacific Southwest Discount Corp.*, 10 Cal.2d 183 [74 P.2d 263), where this court said at page 184: ''The third paragraph of said section of the Constitution [amend. 1934, art. XX, § 22] designated certain organizations and individuals which are exempt from the general provisions of the usury law, and the

legislature was given power to prescribe the maximum rate of interest to be charged in connection with loans made by them. Personal property brokers were included in the exempted classes. While the legislature has acted under this constitutional grant of power as to certain of these exempted classes, it has taken no action respecting the interest charges which may be made by a personal property broker. Therefore, since the adoption of said section of the Constitution in 1934, there has been no provision of law, either statutory or constitutional, limiting the amount of interest or profit which a personal property broker may exact for a loan made by him,'' citing *Matulich* v. *Marlo Investment Co., supra,* 7 Cal.2d 374. It is urged that these cases be overruled. We find no justification for such a course. They have been the law of this state since 1936 and since that time have constituted adequate notice that the regulation of the business of personal property brokers, including their interest and charges, is entirely within the control of the Legislature.

From 1934 to 1939 there were numerous legislative attempts to provide for small loan regulations. In the 1939 session of the Legislature 24 bills were introduced pertaining to interest rates. An analysis of many of these may be found in *"California Legislature Faces the Small Loan Problem"* by Stone and Thomas, 27 California Law Review pages 286, 294 (1939). From this grist a revision of the Personal Property Brokers Act was accomplished. Two bills were passed. (Stats. 1939, ch. 952, p. 2667; Stats. 1939, ch. 1004, p. 2874.) Both enactments were subjected to referendum and both were approved by the electorate of the state on November 7, 1939. Both contained substantially the same provisions. Both were submitted to the voters as amendments to the Personal Property Brokers Act and as statutes regulating interest and charges of personal property brokers on loans of $300 or less, and each provided for the administration of the act by the Commissioner of Corporations.

Section 17 of the revised act captioned "Maximum Rate of Charge" fixed the maximum rate of interest and charges in connection with loans of $300 or less in the following terms: "Every licensee hereunder who lends any sum of money not to exceed three hundred dollars ($300) in amount may contract for and receive charges at a rate not exceeding two and one-half per centum (2½%) per month on that part of the unpaid principal balance of any loan not in excess of one hundred dollars ($100) and two per centum (2%) per month

on any remainder of such unpaid principal balance.'' Charges on such loans were limited to two per cent of the unpaid balance where the lender was insured. Section 20 provided: ''No person, except as authorized by this act, shall directly or indirectly charge, contract for, or receive any interest, discount or consideration greater than the lender would be permitted by law to charge if he were not a licensee hereunder upon the loan, use, or forbearance of money, goods, or things in action, or upon the loan, use, or sale of credit of the amount or value of three hundred dollars ($300) or less.'' The purpose of this section was to permit only licensed personal property brokers to make the charges set forth in section 17 on loans of $300 or less. These two sections are adaptations of sections 13 and 18, respectively of the sixth draft of the Uniform Small Loan Law proposed by the Russell Sage Foundation. (Hubachek, Annotations on Small Loan Laws (1938), 79, 111.) A supplementing section of the uniform law (§ 15) which would limit the maximum charges by licensees on loans in excess of $300, was not included in the 1939 act.

The duty of enforcing the act was reposed in the Commissioner of Corporations whose statutory counsel is the attorney general. (Pol. Code, § 470.) In the years following the effective date of the 1939 statutes frequent requests were made by the commissioner to the attorney general with reference to his power of supervisory control with reference to loans exceeding $300. He was uniformly advised, the last time by written opinion dated March 10, 1948 (11 Adv. Ops. Atty. Gen. 105), that it was not the purpose of the Personal Property Brokers Act of 1939 to limit the interest on or to regulate the charge with respect to loans exceeding $300, and that the Commissioner of Corporations had no power to supervise loans by personal property brokers in excess of $300.

In his advice to the commissioner the attorney general followed the decisions of this court. Because of difficulties arising in the enforcement of the statute the commissioner also sought advice as to his power to curb exorbitant charges. He suggested that he should be held to possess such power on loans of over $300 by virtue of his licensing and rule-making powers. The commissioner is empowered by section 8 of the act to issue licenses ''if he shall find (a) that the financial responsibility, experience, character, and general fitness of the applicant . . . are such as to command the confidence of the community and to warrant belief that the business will be

operated honestly, fairly and efficiently within the purposes of this act . . .'' Section 22 authorizes him to "make general rules and regulations and specific rulings, demands, and findings for the enforcement of this act, in addition hereto and not inconsistent herewith."

Acting under the authority granted by section 22 the Commissioner of Corporations in 1941 promulgated a rule that "a finance company shall not charge on a loan of more than $300 a rate in excess of the statutory rate on that part of the unpaid principal balance of such loan not exceeding the sum of $300." This rule in substance was incorporated in section 1437 of the Administrative Code (tit. 10, p. 141). It was later deleted, probably because of its doubtful validity.

Neither the statute nor the rules adopted pursuant thereto may be interpreted as authorizing the commissioner to establish the rate of interest or charges on loans in excess of $300. ■ The subject of fixing the interest rate and charges of money lenders is a matter of substantive law governing the rights and duties of those affected thereby. It is not the subject of administrative determination. ■ The commissioner, under his rule-making power or otherwise, has no authority to declare what interest rates and charges are unlawful or exorbitant. This may be done only by the Constitution or by legislative enactment consistent with the Constitution. As a consequence the commissioner may not employ his rule-making power or procedural statutory enactment as a means of prohibiting a licensee from doing what the law says he has the right to do. The attorney general correctly advised the commissioner (11 Adv. Ops. Atty. Gen. 105, *supra*) that he could not assume such power (see *First Industrial Loan Co.* v. *Daugherty*, 26 Cal.2d 545 [159 P.2d 921]).

At the 1947 session Assembly Bill No. 663 was introduced. The purpose of this measure was to amend the Personal Property Brokers Act so as to restrict the maximum charges on loan balances of personal property brokers in excess of $300 to 10 per cent per annum. The attorney general states in his brief that this bill was introduced at the request of the Commissioner of Corporations. The measure passed the Assembly but in the Senate failed of passage by a single vote (Senate Journal, June 19, 1947, p. 3277).

The foregoing leads inevitably to the conclusion that the power to regulate the business of personal property brokers, including the fixing of interest and charges on their loans, is,

under the Constitution, vested in the Legislature and that at the present time there is no legislation affecting interest and charges on such loans in excess of $300.

Plaintiff contends that defendant violated and evaded the Personal Property Brokers Act in numerous particulars. He charges that because of asserted trickery practiced upon him he signed blank instruments authorizing charges in addition to the initial obligation which the defendant used to increase the obligation to $18,955.74, whereas the mortgage provided that it was to be security for additional advances of only $250. Whether the additional sums were secured by the mortgage is immaterial, and the trial court found on conflicting evidence that the allegation that the additional advances were not expressly authorized by the plaintiff was untrue. Another point particularly urged is that the defendant entered on its books an overcharge for interest. The court found that the entries in question were unintentional clerical errors which were corrected when discovered. The trial court's findings and conclusions that the defendant committed no violation of the Personal Property Brokers Act are supported by the evidence.

The effect of an amendment to the act in 1945 was to relieve licensees from certain regulatory and penal provisions of the act on bona fide loans of $5,000 or more provided the amending section was not used for the purpose of evading the act. (Stats. 1945, ch. 1221, p. 2321; 2 Deering's Gen. Laws (1947 Supp.), Act 5825, (1st) § 4(d).) Because of this amendment, many of the alleged irregularities would no longer be violations of the act. Nor is there merit in the contention that the defendant resorted to evasion or subterfuge to avoid applicability of those provisions which still apply to loans of less than $5,000. The trial court was justified in concluding from the evidence in this case that the loan in the lump sum of the contract was not an attempt to evade the provisions of the act. Therefore, under the law in effect at the time of the transaction here under consideration the defendant was not guilty of usury as charged in count three, nor was it guilty of violating or evading the act.

The attorney general has suggested that if this court is to arrive at the conclusions hereinbefore announced two federal constitutional questions arise on the face of our Constitution and statute. These questions have been briefed by counsel representing opposing views, and it is requested that we inquire into and decide whether section 22 of article XX and

the interest limitations of the Personal Property Brokers Act are valid under the equal protection clause of the Fourteenth Amendment. Specifically it is stated that a possible violation of that amendment is found in the 1934 constitutional classification of personal property brokers as a preferred group, as against the public in general and as against other lenders similarly situated, and in the classification of loans in the Personal Property Brokers Act by which lenders of more than $300 are subject to restrictions less severe than lenders of lesser sums. These problems are inherent in the case before us and in view of their importance in the enforcement of the law they should be answered.

The classification of personal property brokers as a distinct class has consistently been upheld by California courts as justified by the unique problems of that class. (*In re Halck*, supra, 215 Cal. 500; *In the Matter of Application of Stephan*, supra, 170 Cal. 48; *Eaker* v. *Bryant*, supra, 24 Cal.App. 87.) The Assembly Interim Committee, whose report has been referred to, in 1935 recommended that the classification be retained in future legislation, setting forth the special problems met with in connection with personal property brokers, and stated: ''In the sense that personal property is used as security, it is distinguished from real property by being movable, destructible, difficult to record as to property rights therein, susceptible of abuse as to rights of third persons, and not subject to a period of redemption after foreclosure. These differences make personal property less valuable as security both to borrower and to lender; special regulations are required to overcome these difficulties. Borrowers on personal property are subject to temptations in respect to its treatment after a lien is created, and lenders are tempted to abuses after default. This type of security and the fact that its possession is left with the borrower present problems of regulation peculiar to the class.''

In adopting the 1934 amendment the voters were approving a plan by which the Legislature could regulate the exempted classes in accordance with their peculiar requirements. On highest authority this plan of classification has been approved (*Griffith* v. *Connecticut*, 218 U.S. 563 [31 S.Ct. 132, 54 L.Ed. 1151]; *Mutual Loan Co.* v. *Martell*, 222 U.S. 225 [32 S.Ct. 74, 56 L.Ed. 175]), and it must be held that the exemption of personal property brokers from the usury restrictions of that 1934 amendment was neither unwarranted

nor arbitrary, but on the contrary, was based on sound and reasonable grounds.

 The objections to the Personal Property Brokers Act of 1939 on constitutional grounds are likewise without foundation. The federal equal protection clause does not prevent the Legislature from classifying loans according to size. It has long been recognized that in general borrowers of large sums are better able to protect themselves against excessive charges than small borrowers. The economically weak, those who borrow to meet exigent needs, have been the principal victims of unscrupulous lenders. Consequently legislation pertaining to small loans, usually demarked as above stated as loans of $300 or less, has been common in this state as elsewhere and the classification sustained. (*In re Fuller,* 15 Cal. 2d 425 [102 P.2d 321]; *In re Halck, supra,* 215 Cal. 500.) Hence it was competent for the Legislature pursuant to the authority granted by the 1934 amendment to restrict charges by personal property brokers on loans of $300 or less. It is true that personal property brokers lending sums of more than $300, as well as banks, building and loan associations and certain agricultural associations are not so limited in their interest and charges. But under the plan contemplated by the constitutional amendment the Legislature was expected to enact legislation with respect to the exempt classes whenever the necessity should arise. Because it has found such a necessity with regard to some exempt lenders and not others, does not affect the validity of the plan under the federal Constitution. The Legislature may proceed with deliberateness to strike at abuses wherever they appear and need not formulate simultaneous regulation for all exempted groups. (*Minnesota* v. *Probate Court,* 309 U.S. 270, 275 [60 S.Ct. 523, 84 L.Ed. 744, 126 A.L.R. 530]; *Sproles* v. *Binford,* 286 U.S. 374, 396 [52 S.Ct. 581, 76 L.Ed. 1167].)

The judgment on the first and third causes of action is affirmed. The judgment on the second cause of action is reversed with directions to the trial court to determine the sums due to the plaintiff on the unenforceable portion of the contract relating to the Sterling and Fruehauf vehicles and enter judgment accordingly.

Gibson, C. J., Edmonds, J., Traynor, J., Schauer, J., and Spence, J., concurred.

CARTER, J.—I dissent.

I believe that that portion of the constitutional provision

on usury (Cal. Const., art. XX, § 22, third para.) which excepts certain kinds of lenders, such as personal property brokers, is inoperative under the equal protection clause of the Fourteenth Amendment to the Constitution of the United States, at least until such time as the Legislature acts and makes a reasonable classification and fixes maximum rates for such excepted persons, and that such exception is severable from the balance of section 22, thus leaving in effect the first two paragraphs thereof which provide for a maximum rate of 10 per cent for all lenders.

Section 22 fixes a 10 per cent maximum rate of interest and then exempts from its operation certain named institutions, such as personal property brokers. It leaves to the Legislature the fixing of rates for the exemptees. The sum and substance of it is that until the Legislature acts, *there is a maximum rate of interest fixed for individuals loaning money* but *none whatever* for the named exemptees. They may charge any rate they please. The sole basis of that discrimination is the type or character of the lender, such as personal property brokers, where personal property is taken as security, and not even then, unless the person is engaged in the business of lending money and taking personal property as security. I am cognizant of the fact that the Legislature has acted with respect to personal property brokers but concededly only as to loans of $300 or less. *There is no limit,* as clearly appears from the majority opinion, *on the rates they may charge for loans over $300.* Therefore, it cannot be doubted that under the Constitution and the legislation thus far enacted, John Doe, who makes an occasional loan, not as a business, is limited to a 10 per cent rate of interest regardless of the amount of the loan, whereas the exemptees, for at least all loans over $300, can charge whatever rate they please. I am not unmindful that there may be appropriate reasons for permitting a higher rate to be charged on small loans because of the administrative expense, or on personal loans or those secured by personal property only, than on loans secured by real property because of the disparity in the quality of the security, or that those reasons might constitute a basis for higher rates for businesses which are strictly regulated as to the character of persons who may engage therein and otherwise, but that is not to say that there may be a maximum fixed for individual occasional lenders and *none whatever on the favored few.* The cases—*Griffith* v. *Connecticut,* 218 U.S. 563 [31 S.

Ct. 132, 54 L.Ed. 1151], and *Mutual Loan Co.* v. *Martell*, 222 U.S. 225 [32 S.Ct. 74, 56 L.Ed. 175]—relied upon by the majority, are clearly distinguishable inasmuch as the exemption there was of banks, and the court proceeded upon the assumption that such institutions were not likely to be in such financial straits that they would be compelled to charge exorbitant rates of interest. I do not believe that such an assumption may be made as to personal property brokers. Indeed, the Legislature has so determined, for it restricts the rates of interest that they may charge on loans under $300. It is not to be supposed that the second they make a loan above that amount they become so virtuous and philanthropic that no curb at all on their interest charges is necessary.

I am of the opinion, therefore, that the above mentioned exemption of personal property brokers from the maximum rate of 10 per cent interest for loans of over $300 is inoperative until the Legislature has legislated in the field and made appropriate and constitutional classifications. The restrictions now imposed by the Legislature on loans of $300 and less may stand as there is a valid basis for such a classification. It must necessarily follow that the rate charged in the case at bar was in violation of the above mentioned provision and is therefore usurious.