[Civ. No. 24192.   First Dist., Div. Four.   Dec. 27, 1967.]

BARUCH INVESTMENT COMPANY, Plaintiff, Cross-defendant and Appellant, v. LaVERNE MOORE HUNTOON et al., Defendants and Respondents; HUNTOON ENGINEERING, INC., Defendant, Cross-complainant and Respondent.

Leland, Hoffman & Kalik, N. Stanley Leland and Sherman A. Silverman for Plaintiff, Cross-defendant and Appellant.

Paul Barksdale d'Orr and Henry H. Angell for Defendants and Respondents and for Defendant, Cross-complainant and Respondent.

CHRISTIAN, J.—Plaintiff Baruch Investment Company appeals from a judgment which denied it recovery for breach of an agreement under which respondent Huntoon Engineering (hereinafter Engineering) used its accounts receivable in order to obtain working capital. The court also awarded Engineering $42,951.02 damages on its cross-complaint for usury.

Donald Huntoon and LaVerne Huntoon, husband and wife, were president and secretary respectively of Engineering. In April 1961, the firm was profitably engaged in subcontracting work on a number of government projects but, due to internal litigation, it was unable to obtain money from banks to finance its operations. Cash in the amount of $150,000 was needed to meet immediate obligations, and Mr. Huntoon therefore approached Jack Baruch, president of appellant Baruch Investment Company, with a request to raise the money. Engineering had accounts receivable of greater value than the amount of cash needed. Huntoon testified that Baruch offered to advance 40 percent of the value of the accounts for a period of 45 days if Huntoon would assign the accounts so that Baruch could collect them. Huntoon rejected this idea as he did not want his customers to be contacted by any third party. Later in the discussion Baruch offered to

advance 65 percent of the value of the accounts upon the understandings that no notice of any assignment would be given to the customers and that Huntoon would collect the accounts and remit the proceeds to Baruch from time to time. The accounts were to be subject to a further discount of 1½ percent of their face value for each 45 days of delinquency. This general plan was agreed to orally.

Baruch then presented a printed form of "factoring agreement," stating, "this is only a formality," and Huntoon signed it. A personal guaranty was signed by Mr. and Mrs. Huntoon. Upon that guaranty, appellant originally brought this action. Baruch also made up a schedule listing the affected invoices and gave Huntoon a printed form letter, signed by Baruch, granting Engineering the option to repurchase all accounts which had not been paid in full by the purchasers within 90 days from the date of purchase. That letter continued:

"You will pay to us, upon the exercise of said option, the full amount of each invoice which we shall have purchased from you and which you are repurchasing. This option is granted to you so that you may prevent our undertaking legal action or other action to enforce collection of said accounts which shall not be paid within sixty days from the date of our purchase of said invoices."

The word "sixty" was crossed out and "ninety" substituted only the first time the figure appears. The change was made because Huntoon told Baruch that the 45-day period previously mentioned and the 60-day period were both too short, as the accounts might be paid more slowly.

Baruch kept neither the invoices nor the contracts between Engineering and its debtors, but he did keep copies of the invoices. Huntoon received an advance of $149,423.20 in this first transaction. On November 30, 1961, Huntoon informed Baruch that he needed more money but had no more invoices. Baruch repiled that he could "adjust" the accounts to enable him to make a further advance. Further advances were in fact made. Substantial payments were thereafter made by respondent, but a running balance of obligation continued.

On June 29, 1961, Mrs. Huntoon went to Baruch and requested more money. At that time Baruch had been paid only $5,000 on the first schedule and that was paid out of Engineering's own funds. Baruch then prepared a second schedule from which he discounted $8,914.17, or 3 percent of the gross face value of accounts receivable ($297,139.11). But an additional $6,565.59 discount was taken, which represented

1½ percent interest every 45 days on the unpaid balance of the accounts listed on the first schedule.

Huntoon met with Baruch again on July 12, 1963, when Baruch summoned Huntoon into his office and demanded faster payment. Baruch announced that Engineering owed $84,407.53 and that the amount would increase at the rate of $56.27 per day. Baruch offered to settle for $50,000 or for $40,000 in cash that day. When Huntoon replied he did not have that much money, Baruch threatened to sue. Huntoon pleaded that he could not afford to pay such a high rate of interest, but Baruch replied that he could not grant any relief.

Between April 1961 and July 1963 11 different schedules readjusting the transaction had been prepared by Baruch and signed by one or the other of the Huntoons. On at least five occasions LaVerne Huntoon signed letters authorizing appellant to discount the gross amount of invoices listed on certain schedules by specific sums and to withhold a reserve of 30 percent. This was done both to induce appellant to make further advances and to obtain its forbearance from taking action to collect the accounts already assigned. Each of these letters recites that the authority granted is at variance with the "factoring agreement."

Baruch explained that in each instance he calculated the discount on the basis of the past performance of the debtors in making payments. He admitted that he deviated from the factoring agreement by taking larger discounts than it called for. He also admitted that he discounted from the same unpaid balance on several successive schedules at 3 percent each time and that the amounts which Mrs. Huntoon authorized Baruch to discount were derived from his computations. He denied taking the unpaid balance of accounts receivable from former schedules and rediscounting for every 45-day period during which the accounts remained unpaid.

The contrary was demonstrated in the case of one $7,523.54 discount, authorized in a letter of September 12, 1961, which agreed to that amount of discount from "schedule four." Schedule four gives $7,523.54 as "Our Disc[ount]." The gross amount of that schedule was $84,947.56. Three percent of that figure is only $2,548.13. But taking the unpaid balance from schedule three and rediscounting it 3 percent the exact amount, $7,523.54, may be derived. There was evidence that other amounts discounted were calculated in that manner by Baruch and specifically that the discount on schedule four

contained rediscounts carried forward from unpaid balances on the invoices listed on schedules two and three.

Baruch testified that the "reserve account," referred to above, was to be withheld by him until the full amount of the accounts receivable had been paid to appellant. Then the balance in the reserve account was to be paid over to Engineering.

The trial court found that the transaction was an open loan account masquerading as a sale of accounts, which enabled appellant to procure compensation in excess of the lawful 10 percent per annum for the use and forbearance of money. The assignment of the invoices and evidences of debt was found to constitute a pledge for security; thus the court concluded that appellant's rights terminated when Engineering repaid all sums advanced with the lawful amount of interest.

The total amount advanced by appellant to Engineering, $615,810.06, was paid. Interest at the rate of 10 percent on all balances while they remained unpaid amounted to $11,887.55. Finding that interest in the amount· of $42,951.02 was actually paid, the court awarded damages in that amount on the cross-complaint for usury. No contention is advanced by appellant as to the measure of damages. ▮ When usurious interest has been exacted the debtor is entitled to recover treble the interest paid if he sues within one year (Deering's Gen. Laws (1918) Act 3757, § 3; Stats. 1919, p. lxxxiii) or the bare amount of all interest paid if suit is brought within two years (as in the present case). (*Taylor* v. *Budd* (1933) 217 Cal. 262, 266 [18 P.2d 333].)

▮ On appeal it is contended that California Constitution, article XX, section 22, violates the equal protection clause of the United States Constitution. Article XX, section 22, adopted in 1934, provides that the rate of interest upon any loan shall be 7 percent per annum; but it is provided that parties may contract in writing for a rate not exceeding 10 percent. The section continues: "No person . . . or corporation shall by charging any fee, bonus, commission, discount or other compensation receive from a borrower more than 10 percent per annum. . . ." The third paragraph states that these restrictions do not apply to certain financial institutions, but it is provided that the Legislature may prescribe regulations and maximum rates of interest for the exempted classes. This section in part superseded the Usury Law, an initiative measure adopted in 1918, in which a lawful rate of 7 percent per annum was set, with the right to contract for a maximum

rate of 12 percent. (Deering's Gen. Laws (1918) Act 3757.) Section 3 of the Usury Law created a right to recover treble damages from any person who receives an unlawful rate of interest, if suit is brought within one year of payment. The statute also makes it a misdemeanor to exact unlawful interest in certain situations.

Appellant relies principally upon the dissenting opinion of Mr. Justice Carter in *Carter* v. *Seaboard Finance Co.* (1949) 33 Cal.2d 564, 588-590 [203 P.2d 758].[1] In *Carter* it was asserted that the Personal Property Brokers Act of 1939 (an act by which the Legislature exercised the authority granted it by article XX, section 22, to regulate one of the exempt classes of lenders) unconstitutionally discriminated against personal property brokers loaning less than $300, because a maximum rate was fixed only for small loans. The court rejected this argument, stating:

"The federal equal protection clause does not prevent the Legislature from classifying loans according to size. It has long been recognized that in general borrowers of large sums are better able to protect themselves against excessive charges than small borrowers. . . . But under the plan contemplated by the constitutional amendment the Legislature was expected to enact legislation with respect to the exempt classes whenever the necessity should arise. *Because it has found such a necessity with regard to some exempt lenders and not others, does not affect the validity of the plan under the federal Constitution.* The Legislature may proceed with deliberateness to strike at abuses wherever they appear and need not formulate simultaneous regulation for all the exempted groups." (33 Cal.2d at p. 588; italics added.) That holding disposes of the constitutional attack upon article XX, section 22.

▆ Appellant also asserts that the treble damages and misdemeanor provisions of the Usury Law (neither of which is involved in the present case) discriminate by penalizing some classes, but not others, for identical acts. But appellant lacks standing to attack the constitutionality of the Usury Law. A court will not consider the constitutionality of a stat-

---

[1]Justice Carter, dissenting, would have held that the third paragraph of section 22, exempting certain types of lenders, violates the equal protection clause and is inoperative, "at least until such time as the Legislature acts and makes a reasonable classification . . . for such excepted persons, and that such exception is severable from the balance of section 22, thus leaving in effect the first two paragraphs thereof which provide for a maximum rate of 10 per cent for all lenders." (33 Cal.2d at p. 589.)

ute at the request of a person against whom no attempt has been made to enforce the statute. (*Stephenson* v. *Binford* (1932) 287 U.S. 251, 277-278 [77 L.Ed. 288, 53 S.Ct. 181, 87 A.L.R. 721]; 16 Am.Jur.2d, Constitutional Law, §§ 119-122, pp. 310-318.) ''The controlling question is whether the appellant 'has sustained or is immediately in danger of sustaining some direct injury as the result of [the statute's] enforcement. . . .' (*Massachusetts* v. *Mellon*, 262 U.S. 447, 488 [67 L.Ed. 1078, 1085, 43 S.Ct. 597].)'' (*Cramp* v. *Board of Public Instruction* (1961) 368 U.S. 278, 282-283 [7 L.Ed.2d 285, 289, 82 S.Ct. 275].)

Appellant's attack upon the findings of the trial court may be summarized as follows: the trial court looked only at the final result of the transactions, determined that the discounts exceeded 10 percent per annum upon the amounts advanced to respondents, and ignored the asserted fact that appellant merely used normal and logical business methods in arriving at the amounts of the discounts. Appellant insists that the signed, printed form of factoring agreement is controlling, and cites us to several items of evidence suggesting that the transaction might have been a series of sales.

Accounts receivable financing is an uncertain area in the usury law and no exact tests have been formulated. ■ The question whether a transaction is a sale or a usurious loan is one of fact and the trier of fact should look to substance rather than to form. (*Thomas* v. *Hunt Manufacturing Corp.* (1954) 42 Cal.2d 734, 740 [269 P.2d 12]; *Wooton* v. *Coerber* (1963) 213 Cal.App.2d 142, 145 [28 Cal.Rptr. 635].) ■ We must determine whether there is any substantial evidence to support the findings and, where a finding of either a loan or a sale can be inferred from the facts, we may not substitute our judgment for that of the trial court. (*Wooton* v. *Coerber, supra; Whittemore Homes, Inc.* v. *Fleishman* (1961) 190 Cal. App.2d 554, 559 [12 Cal.Rptr. 235].) ■ The appellant must demonstrate the insufficiency of the evidence. (*Valdez* v. *Clark* (1959) 173 Cal.App.2d 476, 479 [343 P.2d 281].)

Appellant insists that the printed form of factoring agreement and the contemporaneously executed documents embody the contract. The trial court, however, found that the factoring agreement was amended and its terms waived by Baruch. It was not disputed that Baruch constantly deviated from the factoring agreement. It is claimed that the agreement of Advance not to notify Engineering's debtors of the assignment and not to collect directly from them does not make a

transaction a loan. ■ A loan may be found even if the "buyer" gives notice and collects the debts. (*Milana* v. *Credit Discount Co.* (1945) 27 Cal.2d 335, 342 [163 P.2d 869, 165 A.L.R. 621].) But notice of assignment and collection by the "buyer" are evidentiary factors for the trier of fact to consider in making its determination. Notification normally indicates a sale, and non-notification normally indicates a loan. (See note: *Accounts Receivable Financing*, 14 Stan.L. Rev. 520, fn. 6 [May 1962].)

■ Appellant asserts that there is no evidence to show that Engineering was obligated to repay money paid by appellant to respondents. But paragraph 2(d) of the "factoring agreement" provided that "[Engineering] guarantees the payment of all Accounts receivable purchased hereunder to the extent of the amount paid therefor by [appellant]." Respondents D. W. and LaVerne Huntoon personally guaranteed full and faithful performance of that agreement. The court was also entitled to consider the fact that once respondents were involved with appellant, they began to sink into a bog of ever more crippling discounts more characteristic of an undesirable type of loan business than of accounts receivable financing. It is also significant that when the accounts were slow in paying appellant did not elect to proceed against the debtors whose accounts had supposedly been purchased. Instead, appellant badgered the Huntoons, indicating that they, and Engineering, were regarded all along as the debtors.

Appellant points to *Advance Industrial Finance Co.* v. *Western Equities, Inc.* (1959) 173 Cal.App.2d 420 [343 P.2d 408], and *Refinance Corp.* v. *Northern Lumber Sales, Inc.* (1958) 163 Cal.App.2d 73, 78 [329 P.2d 109], as cases where similar "factoring agreements" have been upheld. In *Advance*, the intent to sell accounts rather than use them as security for a loan appeared on the face of the contract; the court stated that *Milana* did not establish that a contract for purchasing receivables is, per se, a loan. (173 Cal.App.2d at p. 429.) But there the "factoring agreement" (apparently identical with the printed form used in this case) was unmodified; the facts are distinguishable in other ways as well.

In *Milana* v. *Credit Discount Co., supra,* 27 Cal.2d 335, 339, plaintiff required funds immediately to operate her established business and meet payrolls. Defendant offered to render financial assistance, through a "sales agreement," by buying all of plaintiff's accounts in separate schedules at face value, less any customer's discount, less an additional 2 percent dis-

count. Plaintiff was to receive 85 percent of the face value upon assignment and the balance, less discounts, was to be held in a reserve account for payment to plaintiff after all the accounts listed on the schedules were paid in full. Plaintiff unconditionally guaranteed to pay every account within 60 days after assignment. In practice, accounts not so paid were returned to plaintiff and "repurchased" by defendant, who took an additional discount. Later, the discount rate was raised to $2\frac{1}{2}$ percent. Plaintiff gave notices of assignment to her customers and was obligated to transfer all collections to defendant in their original form as cash or checks. After reciting the factors to be weighed in determining whether a loan exists, the Supreme Court held that by the contracts and actual practice defendant had secured itself against loss and protected a return of 2 to $2\frac{1}{2}$ percent every 60 days. (27 Cal.2d at p. 340.) In all the circumstances, the court found indications that the parties had provided for a "conditional transfer of title; that advances by the defendants were contemplated to be repaid within a specified time at a charge for the use of the money which was deducted in advance . . . the transactions were not sales of accounts receivable but loans secured by assignments of the accounts at usurious rates of interest. . . ." (27 Cal.2d at pp. 341-342.) The court observed that while continued collection of accounts by the seller (as in the instant case) would have been a factor indicating a loan, a more significant fact was that had defendant taken absolute title there would be no need to guarantee payment within specified periods or to repurchase the accounts. The guaranties were held to amount to promises to repay money loaned at a usurious rate.

Here respondents, similarly in immediate need of financing, guaranteed repayment of sums advanced within a specified period under the "factoring agreement" and also were granted the right to "repurchase" accounts in default for the full amount of each invoice. The court found that, in practice, defaulted accounts were subjected to additional interest through the device of carrying them forward and rediscounting them, a device similar to the "repurchasing" in *Milana*. The present case indeed presents stronger indications of usury than *Milana* since there notification was given to the debtors.

In *Refinance Corp.* v. *Northern Lumber Sales, Inc., supra*, 163 Cal.App.2d 73, the other case principally relied on by appellant, the plaintiff agreed to purchase all accounts *with-*

*out recourse* provided plaintiff first approved the debtor's credit. If there was no approval, the purchase was with recourse, but defendant would have the account returned upon the customer's default. The court, after quoting extensively from *Milana,* found that there was no loan and no guaranty of repayment of the purchase price. The court stated that the giving of a guaranty is simply an item of evidence to be considered by the trial court and that there was substantial evidence to support the trial court's finding of a sale. Here the trial court reached a contrary result, on evidence which we regard as sufficient.

Appellant next contends that if the transaction was a loan, there were ten separate loans and all but the last three occurred more than two years before the action was commenced and hence recovery is barred by Code of Civil Procedure, section 339, subdivision 1. Appellant argues that Engineering's obligation to repay the amounts loaned arose immediately when the money was advanced, presumably because at that time the ''discount'' was entered on the schedules. But an action for money had and received could not be brought before any money was transferred to appellant from respondent. Until the borrower has paid interest in excess of the lawful rate he may not maintain an action to recover usurious interest against the lender. (*Weiss* v. *Brandt,* (1955) 137 Cal.App.2d 710, 719 [290 P.2d 626].) Where there is no written agreement as to the allocation of payments between principal and interest, such an agreement may be proved by parol. But all payments will be applied to reducing the principal unless there is an express agreement to apply them to interest or an actual application to interest by the creditor. In *Weiss,* 65 separate assignments of purchase orders were held to be one transaction because it was demonstrated that several of the assignments were tied into one by ''charge backs'' on earlier orders to later orders. Since there was but a single loan all payments were allocated to principal as a matter of law.

Appellant asserts that here there was an actual application of payments to interest since appellant paid itself the discounts from the accounts. Actually, the record shows that the money which appellant received from collection of accounts, or from Engineering, was entered on the schedules by means of credit memoranda, which reduced the face value of the accounts listed on the schedules. There was no readjustment of the discounts, which the court found to represent

interest. Therefore the cross-complaint was not barred by the statute.

Appellant pleaded as a defense to the cross-complaint a document, signed on June 28, 1962, by LaVerne Huntoon, which purportedly released appellant from all claims of any kind, known or unknown, from the beginning of the world to the date of execution. The court below found, relating the circumstances in detail, that this release was procured "only by the exercise of duress, coercion and illegal business compulsion, . . ." Appellant contends that the evidence is insufficient to support this finding on the ground that there was no competent evidence indicating the existence of over-reaching. We need not consider this contention, as another finding is determinative of the issue: while the release was signed on June 28, 1961, the usurious interest was paid on July 24 and October 1, 1962. A "voluntary" payment of excessive interest does not waive the usury laws, which are designed for the protection of society. (*Stock* v. *Meek* (1950) 35 Cal.2d 809, 817 [221 P.2d 15].) *A fortiori* a general waiver of rights, executed before usurious interest was paid, could not defeat the respondent's cross-complaint.

The judgment is affirmed.

Devine, P. J., and Rattigan, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied February 21, 1968.