[L.A. No. 29656. In Bank. June 1, 1970.]

WEST PICO FURNITURE COMPANY OF LOS ANGELES, Plaintiff, Cross-defendant and Appellant, v.
PACIFIC FINANCE LOANS, Defendant, Cross-complainant and Appellant.

## Counsel

Ralph H. Winkler, Ellis J. Horvitz and Ted T. Ward for Plaintiff, Cross-defendant and Appellant.

Sheppard, Mullin, Richter & Hampton, George R. Richter, Jr., and Frank Simpson III for Defendant, Cross-complainant and Appellant.

David M. Turner, Styskal, Wiese & Colman, Alvin O. Wiese, Jr., Severson, Werson, Berke & Bull, James B. Werson, Buchalter, Nemer, Fields & Savitch, Jerry Nemer, Joseph Weissman, Kupfer, Silberfeld, Nathan & Danziger, Eli S. Silberfeld, Dinkelspiel & Dinkelspiel, Norman Coliver and John F. Taylor as Amici Curiae on behalf of Defendant, Cross-complainant and Appellant.

Thomas C. Lynch, Attorney General, and Arthur de Goede, Deputy Attorney General, as Amici Curiae.

## Opinion

**SULLIVAN, J.**—In this action to recover statutory penalties for usury and to obtain an accounting we examine the financing methods of a personal property broker. We uphold the trial court's finding that the transactions under scrutiny did not constitute purchases by the broker of conditional sales contracts but were in fact loans by the broker secured by pledges of such contracts. As we explain *infra,* we conclude that the loans were exempted from the provisions of the Personal Property Brokers Law prescribing maximum charges and rates, were not violative of specified provisions of that law so as to render them void and unenforceable, and were not usurious. Accordingly, we conclude that plaintiff is not entitled to relief under the above law, the general usury law, or the common law, and that defendant is entitled to relief on its cross-complaint. We reverse the judgment with directions.

Plaintiff West Pico Furniture Company of Los Angeles (West Pico) is a California corporation organized on January 2, 1953, and at all times material herein was engaged in the business of selling furniture at retail. West Pico (sometimes referred to herein as the new company) was the successor to the business of West Pico Furniture Company, the so-called original or old company. Defendant, Pacific Finance Loans (Pacific), at all times material herein was a California corporation engaged in the business of a personal property broker in Los Angeles County and under

the provisions of the Personal Property Brokers Law (Fin. Code, §§ 22000-22653)[1] duly licensed as such. (§§ 22008, 22009; 22200.)[2]

For some time prior to 1953 plaintiff's predecessor (the old company) had been selling furniture at retail on conditional sales contracts and had been financing its operation through a line of credit established with the Bank of America (Bank). Loans made by the Bank were secured by conditional sales contracts (hereafter "contracts") pledged by the furniture company. Under this arrangement, the old company was obligated to make all collections on the pledged contracts and to remit them monthly to the Bank. Employees of the Bank audited these collections at the offices of the furniture company. Interest was computed on the unpaid balance of the contracts pledged to the Bank.

In early 1953, Walpole, president of the old company, began to discuss the financing of its operations with Pacific's representatives Woessner and Lindquist. As a result Pacific agreed to buy at a discount some of the contracts which had been pledged to the Bank but declined to take over the entire line of credit.

To effectuate this arrangement, Pacific's legal department prepared a standard form "no recourse" sales agreement and on January 23, 1953, Pacific made an initial purchase from the furniture company of "aged" contracts in the amount of $24,754.10. Two other purchases of pledged contracts followed: On January 29, 1953, in the sum of $66,428.23, and on March 27, 1953, in the sum of $60,117.94. Pacific paid the amounts directly to the Bank which in turn applied them as credits to the loan account.

After the purchase of these prime, aged contracts, negotiations turned to the purchasing of the furniture company's "house accounts." These represented conditional sales contracts which were not acceptable to the Bank because the purchaser had made no down payment, was a poor credit risk or was otherwise unsuitable. As to these, Pacific demanded

---

[1]Hereafter, unless otherwise indicated, all section references are to the Financial Code.

[2]Section 22008 provides: " 'Licensee' means any personal property broker or broker who receives a license in accordance with this division."

Section 22009 provides: " 'Personal property broker,' includes all who are engaged in the business of lending money and taking in the name of the lender, or in any other name, in whole or in part, as security for such loan, any contract or obligation involving the forfeiture of rights in or to personal property, the use and possession of which property is retained by other than the mortgagee or lender, or any lien on, assignment of, or power of attorney relative to wages, salary, earnings, income, or commission."

Section 22200 provides: "No person shall engage in the business of a personal property broker or broker without obtaining a license from the commissioner."

"protection." Accordingly, Woessner and Walpole discussed revision of the existing form of agreement and stipulated that such contracts would be sold under a full recourse agreement. On June 2, 1953, the parties executed such an agreement. It was substantially the same as the prior agreements except that the old company was required to collect the installments and remit them daily to the finance company. However, notwithstanding the "no recourse" provision carried over from the prior agreements, the parties agreed in a so-called "side letter" that the old company would repurchase any of the contracts which were delinquent for 60 days or more or would substitute other contracts acceptable to defendant. Similar purchase agreements with "side letters" were entered into on June 18, 1953 and August 18, 1953.

In the meantime, the furniture company had engaged one Goodson, a tax attorney and accountant, to review its operations. The latter made two recommendations: first that its financing arrangements be treated as loans; and second, that a new company be organized to take over the business. Accordingly, the new company, West Pico Furniture Company of Los Angeles was incorporated on January 2, 1953, about the time when the old company and Pacific were negotiating their first transaction.

In the summer of 1953, Goodson met with Lindquist and Woessner and explained his plan to defer taxes for West Pico by treating the financing arrangements as loans. Pacific's attorney rejected the plan. As a result the parties agreed that the sale-with-recourse documentation would be retained but that West Pico would report the transactions on its tax returns as "pledges and borrowings" even though the tax treatment of the same transactions by the parties would be inconsistent.

On September 2, 1953, West Pico (new company) and Pacific carried out their first transaction. The previous documentation was retained except that the "without recourse" term and certain warranties were eliminated, and a provision requiring West Pico to repurchase any contracts delinquent for 60 days was added. Pacific paid West Pico $49,558.76 for the contracts involved. On September 11, 1953, West Pico sold Pacific additional contracts for $52,542.30. Neither agreement, however, used the "side letter" device.

On October 23, 1953, the parties executed a "master" agreement covering all future transactions thus eliminating the necessity of a separate agreement for each. This new agreement required West Pico to repurchase any contracts delinquent for 60 days but gave it the option to attempt to collect on these contracts in lieu of repurchase. In other respects the agreement was the same as that entered into in September.

By the end of February 1954, West Pico had become dissatisfied with these arrangements because of the large payments it was obligated to make under the repurchase provisions. After negotiations during which West Pico threatened to terminate financing with Pacific, the parties agreed to make a new agreement limiting West Pico's liability in respect to repurchases to 10 percent of the aggregate unpaid principal balances. This was to be handled by means of a 10 percent deduction for a reserve in addition to the discounts taken on each "sale." The new "master" agreement was entered into on March 19, 1954. At the same time, however, the parties apparently had an understanding that no reserve would in fact be established.

Pursuant to this agreement, West Pico delivered contracts to Pacific in bundles, and Pacific in turn issued checks to West Pico for the aggregate of the dollar amounts of the contracts in each bundle, less the aggregate of Pacific's discounts. Each contract was then individually endorsed with a statement that it was "assigned, transferred and set over to Pacific . . . for value received."

The record discloses that more than 371 bundles, comprising 5,600 contracts totalling $4,552,200.86 in principal amount, were "sold" to defendant under this arrangement.[3] The total "purchase price" paid by Pacific to West Pico was more than $2,971,505.55.

Although Pacific relied solely on West Pico for a verification of the customer's (conditional vendee's) credit, it did notify such customers that their contracts had been assigned to it; in addition Pacific serviced all delinquent contracts, sending West Pico each month lists of those which were delinquent for 30 days and for 60 days respectively. The aggregate amount of those repurchased by West Pico did not exceed the 10 percent limitation.[4]

In 1959 West Pico brought the instant action. Its first amended complaint set forth two separately stated causes of action sounding in usury, predicated upon the theory that the contract of March 19, 1954, was a device and scheme to evade the usury laws and that the transfers by plaintiff to defendant of conditional sales contracts were in fact made as security for usurious loans. The first cause of action sought recovery of treble the amount of interest paid by plaintiff to defendant within one year immedi-

---

[3]The evidence does not show all purchases made during this period. These totals represent sales made between October of 1955 and March of 1959, the date of the last sale of contracts to Pacific.

[4]The total amount of 60-day delinquent contracts for the entire period appears to be $333,794.07; the total unpaid principal balance for the shorter period 1955-1959 was $3,552,200.86.

ately preceding commencement of the action (Stats. 1919, p. lxxxiii; Deering's Gen. Laws, 1919, Act 3757); the second cause of action sought damages equal to the amount of interest paid by plaintiff within two years immediately preceding the commencement of the action. (*Stock* v. *Meek* (1950) 35 Cal.2d 809, 816-817 [221 P.2d 15]; *Taylor* v. *Budd* (1933) 217 Cal. 262, 266-267 [18 P.2d 333].) Each cause sought an accounting. Pacific filed an answer denying that the transactions were loans and a cross-complaint seeking indemnity for losses sustained in respect to some of the conditional sales contracts purchased by defendant. West Pico filed an answer to the cross-complaint denying any indebtedness to Pacific and also counterclaimed for the full face amount of all conditional sales contracts pledged to Pacific on the theory that the loans violated numerous provisions of the Personal Property Brokers Law.

The trial court found and concluded, so far as is here material, that the transactions in which West Pico delivered conditional sales contracts to Pacific and the latter issued its checks to West Pico were not sales of said contracts but were loans of money by defendant to plaintiff; that the so-called master agreement of March 19, 1954, was prepared and used by Pacific for the purpose of making loans of money appear to be sales of conditional sales contracts; that pursuant to said contract Pacific, on numerous occasions, loaned to West Pico substantial sums of money at a rate of interest and for charges in excess of those permitted by law; that the loans were not bona fide loans; that the charges made by Pacific to West Pico violated sections 22451[5] and 22453[6] and were therefore void under sections 22650,[7] 22651[8] and 22652;[9] that each loan violated sections 22454[10]

---

[5]Section 22451 as it provided at the time of these transactions read: "Every licensee who lends any sum of money may contract for and receive charges at a rate not exceeding the sum of the following:

(a) Two and one-half percent (2½%) per month on that part of the unpaid principal balance of any loan up to, including, but not in excess of two hundred dollars ($200).

(b) Two percent (2%) per month on that portion of the unpaid principal balance in excess of two hundred dollars ($200) up to, including, but not in excess of five hundred dollars ($500).

(c) Five-sixths of one percent (5/6 of 1%) per month on any remainder of such unpaid principal balance in excess of five hundred dollars ($500)."

[6]Section 22453 provides: "No amount in excess of that allowed by this article shall be directly or indirectly charged, contracted for, or received by any person, and the total charges of the personal property broker and broker and any other person in the aggregate shall not exceed the maximum rate provided for in this article."

[7]Section 22650 provides: "No loan made within this State, for which a greater rate of interest, consideration, brokerage, and charges than is permitted by this division has been charged, contracted for, or received, shall be enforced in this State,

[8,9,10] Footnotes on following page.

22455,[11] 22473 subdivisions (a) and (b),[12] and 22467[13] and were therefore void; and that neither plaintiff nor defendant were entitled to recovery. Judgment was entered accordingly.

West Pico has appealed from those portions of the judgment denying it any relief on its complaint or counterclaim to the cross-complaint and awarding Pacific costs. Pacific has cross-appealed from that portion of the judgment denying it any relief on its cross-complaint.

At the center of the controversy before us is the question whether the trial court properly decided that the transactions here involved were loans and not sales. West Pico urges that there is sufficient evidence sup-

and every person participating in the making, contracting, or collecting of such loan in this State is subject to the provisions of this division."

[8]Section 22651 provides: "If any amount other than or in excess of the charges permitted by this division is charged, contracted for, or received, except as the result of an accidental and bona fide error in computation, the contract of loan is void, and no person has any right to collect or receive any principal, charges, or recompense in connection with the transaction."

[9]Section 22652 provides: "Except as provided in Section 22651, if any provision of this division is violated in the making or collection of a loan, the contract of loan is void, and no person has any right to collect or receive any principal, interest, or charges in connection with the transaction."

[10]Section 22454 in pertinent part as it provided at the time of these transactions read: "Except as provided in Article 3 of this chapter, all charges on loans made under this division shall be computed and paid only as a percentage per month of the unpaid principal balance or portions thereof, and shall be so expressed in every obligation signed by the borrower. . . ."

[11]Section 22455 provides: "Except as provided in Article 3 of this chapter no charges on loans made pursuant to this division shall be paid, deducted, or received in advance, or compounded. The licensee shall deliver to the borrower at the time of making the loan an amount to be retained by the borrower equal to the face value of the loan and the note evidencing the loan."

[12]Section 22473 provides: "Each licensed personal property broker shall:

(a) Deliver or cause to be delivered to the borrower, or any one thereof, at the time the loan is made, a statement showing in clear and distinct terms the name, address, and license number of the personal property broker and the broker, if any. The statement shall show the date, amount, and maturity of the loan contract, how and when repayable, the nature of the security for the loan, and the agreed rate of charge.

(b) Obtain from the borrower a signed statement as to whether any person has performed any act as a broker in connection with the making of the loan. If such statement discloses that a broker or other person has participated, then the personal property broker shall obtain a full statement of all sums paid or payable to the broker or other person. The personal property broker shall keep such statements for a period of two years from and after the date the loan has been paid in full, or has matured according to its terms, or has been charged off. . . ."

[13]Section 22467 provides: "No licensee shall take any confession of judgment or any power of attorney, except a power of attorney taken to effectuate the transfer of the ownership of any motor vehicle at the time of making the loan."

portive of the finding below. Pacific argues that, as a matter of law, the transactions were not loans and alternatively, even if they were, the Personal Property Brokers Law exempted them from any restrictions as to the amount of interest charged. We proceed to consider these opposing positions.

■ Whether a particular transaction is a usurious loan or a sale is a question of fact. (*Baruch Inv. Co.* v. *Huntoon* (1967) 257 Cal.App.2d 485, 492 [65 Cal.Rptr. 131]; *Wooton* v. *Coerber* (1963) 213 Cal.App.2d 142, 145 [28 Cal.Rptr. 635].) In making such a determination, the trier of fact must look to the substance of the transaction rather than to its form. (*Milana* v. *Credit Discount Co.* (1945) 27 Cal.2d 335, 340 [163 P.2d 869, 165 A.L.R. 621]; *Baruch Inv. Co.* v. *Huntoon, supra; Wooton* v. *Coerber, supra; Janisse* v. *Winston Inv. Co.* (1957) 154 Cal.App.2d 580, 582 [317 P.2d 48, 67 A.L.R.2d 225].) In the last cited case the court emphasized that "Where the form of the transaction makes it appear to be nonusurious, it is for the trier of the fact to determine whether the intent of the contracting parties was that disclosed by the form adopted, or whether such form was a mere sham and subterfuge to cover up a usurious transaction." Thus we observed in *Milana* that the "courts have been alert to pierce the veil of any plan designed to evade the usury law and in doing so to disregard the form and consider the substance. [Citations.]" (27 Cal.2d at p. 340.)

In *Milana* v. *Credit Discount Co., supra,* 27 Cal.2d 335, we were concerned with financing arrangements quite similar to those now engaging our attention. There the parties through a purported "sales agreement" agreed to the purchase by the finance company of all acceptable accounts receivable at face value less specified discounts. We there delineated the differences between a sale and a loan in the following language: "A sale is the transfer of the property in a thing for a price in money. The transfer of the property in the thing sold for a price is the essence of the transaction. The transfer is that of the general or absolute interest in property as distinguished from a special property interest. A loan, on the other hand, is the delivery of a sum of money to another under a contract to return at some future time an equivalent amount with or without an additional sum agreed upon for its use; and if such be the intent of the parties the transaction will be deemed a loan regardless of its form. [Citations.]" (27 Cal.2d at p. 339.) Emphasizing the necessity of appraising the transaction as disclosed by the evidence as a whole rather than by what the transaction *appears* or is *represented* by the parties to be, we observed that "All of the negotiations, circumstances and conduct of the parties surrounding and connected with their contracts may be material in determining whether the form thereof covered an intent to violate the usury law . . . ." (27 Cal.2d at p. 341.)
■ In reviewing the determination of the trier of fact the role of an appel-

late court is to determine whether there is any substantial evidence to sustain the finding of the trier of fact, and, "where a finding of either a loan or a sale can be inferred from the facts, we may not substitute our judgment for that of the trial court. [Citations.]" (*Baruch Inv. Co.* v. *Huntoon, supra,* 257 Cal.App.2d 485, 492.)

The record before us discloses, as we have already pointed out, that West Pico in making its arrangements for financing with Pacific sought to have them carried out on the basis of loans with a pledge of its customer's contracts as collateral. This not only would have continued the mode of financing utilized by the original furniture company with the Bank of America but would have coordinated plaintiff's financing with its new accounting and tax reporting procedures. Pacific rejected these proposals, insisting upon a method fashioned upon the sale by West Pico and the purchase by Pacific of the furniture company's conditional sales contracts, but at the same time requiring "side letters" for "protection." Thus the so-called master agreement of March 19, 1954, provided for an absolute purchase and sale of the contracts, while the side letters provided that the transactions covered by the agreement were nevertheless to be subject to full recourse against West Pico and to an obligation upon the latter to repurchase any contracts delinquent for 60 days.

The March 1954 agreement, although providing that Pacific "shall make every effort" to collect the accounts which it purchased, nevertheless continued, rather strangely, to the effect that if Pacific were not successful in doing so, "then it is agreed that the Seller may, at its election, repurchase said accounts for the net unpaid principal balance" and that if it did not so elect, Pacific "may demand of Seller that Seller reimburse Pacific for said loss, . . ." In other clauses of the contract, West Pico agreed to collect any sums due on the conditional sales contracts and to remit them daily to the finance company. As the trial judge observed, all of these provisions seem to be unusual if not incongruous in an agreement providing for an outright sale of the conditional sales contracts.

There was other substantial evidence from which it could be inferred that the parties treated the transactions not as sales but as loans. Defendant's employees testified that upon delivery of the "bundles" of contracts to Pacific, the latter's personnel made no attempt to check the credit ratings of West Pico's customers who signed them. They further testified that whenever such contracts became 30 to 60 days delinquent, Pacific notified West Pico, there being an understanding that the latter company would then repurchase the delinquent contracts. According to these same employees, the personnel at Pacific's branch offices had no knowledge of any 10 percent

limitation[14] on West Pico's liability for losses sustained by Pacific on the "purchased" contracts, any information received by them as to the outstanding unpaid balance of the contracts being fortuitous and the result of casual conversation. At no time were they informed by their superiors of plaintiff's balance for the purpose of applying any limitation on liability.

From the foregoing evidence the trial court was justified in concluding that at all times the risk of nonpayment of the conditional sales contracts was borne by West Pico and not by Pacific, and that the transactions instead of being sales represented loans of money to West Pico by Pacific for which the contracts were pledged as collateral.

Pacific asserts that as a matter of law there were no loans. Resting its argument on Civil Code section 1912,[15] Pacific argues that since under the agreement West Pico's liability was limited, Pacific as the putative lender would never in fact receive the equivalent of what it had allegedly loaned, so that there could be no loan under the circumstances. The validity of the argument thus depends upon Pacific's unarticulated assumption that a limitation on West Pico's liability actually obtained. The trial court, very properly considering and weighing the evidence *as a whole* rather than confining its examination to the transactions as represented in the written master agreement of the parties (see *Milana* v. *Credit Discount Co., supra,* 27 Cal.2d 335, 341) rejected this explanation of Pacific in holding that the transactions were loans. The court expressly found that "defendant did not withhold any money from any loan as a reserve fund under said contract." Indeed the uncontradicted testimony of West Pico's president was to the effect that the parties orally agreed to continue their previous arrangements (providing for full recourse against plaintiff) despite the March 1954 agreement and that the 10 percent limitation on West Pico's liability would be disregarded. In sum, there is simply no basis for concluding on this record that as a matter of law there were no loans. We reject as equally unfounded, Pacific's alternate argument that there is no substantial evidence supporting the trial court's finding that the transactions *were* loans.

We also reject Pacific's related argument that no loans were intended by the parties. It should be enough to reiterate what we have said above, namely that the trial court found on substantial evidence that despite the

---

[14]The March 1954 agreement provided that West Pico "shall not be liable or obligated to reimburse Pacific for losses, should Seller have already reimbursed Pacific on losses to an extent in excess of 10% of the aggregate unpaid principal balance of assets sold hereunder, . . ."

[15]Civil Code section 1912 provides: "A loan of money is a contract by which one delivers a sum of money to another, and the latter agrees to return at a future time a sum equivalent to that which he borrowed. A loan for mere use is governed by the chapter on loan for use."

efforts of the parties to disguise the transactions as sales, "[a]ll of the negotiations, circumstances and conduct of the parties surrounding and connected with their contracts" (see *Milana* v. *Credit Discount Co., supra,* 27 Cal.2d 335, 341) clearly showed that the parties intended them to be loans. Relying on the *Milana* case, Pacific argues that since both parties treated it as the assignee of the contracts, there was an absolute transfer of property and hence no debtor-creditor relationship. The reliance is misplaced. In the words of *Milana,* the trial court in the instant case has been "alert to pierce the veil of any plan designed to evade the usury law and in doing so to disregard the form and consider the substance." (27 Cal.2d 335, 340.)[16]

■ Since the record establishes that the transactions were loans, we now turn to consider the application of the Personal Property Brokers Law (see fns. 1 and 2, *ante;* hereafter for brevity referred to as the Act).[17] At the outset it is clear that in making the loans to West Pico, Pacific did so for charges, and at rates, in excess of those permitted by the Act. The trial court so found and concluded that each charge was in violation of sections 22451 and 22453 (see fns. 5 and 6, *ante*). Pacific does not now attack this finding. Assuming *arguendo* that it loaned money to West Pico, Pacific contends that under the Act it was completely exempted from any limitation on rates of interest. If, in fact, it loaned money to West Pico, so the argument runs, the amount of the loan was at least $2,971,505.15[18] and was subject to no restrictions since by virtue of section 22053, sections 22451 and 22453 of the Act have no application to bona fide loans of $5,000 or more. We shall explain why Pacific is correct in asserting that the instant loans were subject to no restrictions.

Section 22053 as in effect at the time of these transactions,[19] provided as follows: "The following sections of this division do not apply to any bona fide loan of a principal amount of five thousand dollars ($5,000) or more

[16]In view of the settled practice of California courts to probe the substance of the transaction in question, we are not persuaded to a different conclusion by defendant's citation of *Coast Finance Corp.* v. *Ira F. Powers Furniture Co.* (1922) 105 Ore. 339 [209 P. 614, 24 A.L.R. 855]. It was there held that under the particular facts of that case the trial court was warranted in finding that the assignment of a conditional sales contract was a bona fide sale and not a loan. Obviously the decision cannot be persuasive in respect to the case at bench where the trial court reached a different result on the particular facts here presented.

[17]In using "Act" instead of "Law" as a short term of reference we follow a number of appellate court decisions.

[18]This figure represents the total of all checks made and delivered by Pacific to West Pico over the period beginning October 12, 1955 and ending March 31, 1959.

[19]Section 22053 was amended in 1967 (Stats. 1967, ch. 533, § 1) long after the transactions here involved. This amendment made no changes in the language of the section other than to enumerate additional sections of the Act made inapplicable to loans of $5,000 or more meeting the conditions of section 22053. The only additional section involved in the instant case is section 22467 which we discuss *infra*.

or to a duly licensed personal property broker in connection with any such loan, if the provisions of this section are not used for the purpose of evading this division . . . ." (Section 22053 thereafter enumerated 25 sections of the Act including sections 22451 and 22453.) Thus the above section granted a conditional exemption from the specified sections of the Act to either of the following: (1) a bona fide loan of the principal amount of $5,000 or more; or (2) a duly licensed personal property broker (see fn. 2, *ante*) in connection with *any such loan*. The condition which must be satisfied before the exemption becomes applicable is that section 22053 is not used for the purpose of evading the Act.

As we have said, Pacific invokes the exemptive provisions of the section on the ground that its financing transactions constituted a "bona fide loan of the principal amount of . . . ($5,000) or more . . . ." The parties, however, are in sharp disagreement as to the meaning of the above-quoted language of the statute. Focusing its attention upon the words "bona fide loan," West Pico argues that "bona fide" or its English counterpart "good faith" denotes honesty of purpose and freedom from fraud or subterfuge, that the term qualifies the word "loan" immediately following rather than the words "principal amount of . . . ($5,000) or more," and that the term "bona fide" relates to the *character* and *quality* of the loan rather than to its *amount*. It, therefore, contends that since the transactions here involved were "cast" as sales rather than as loans for the purpose of concealing their true character, they could not constitute bona fide loans and that the trial court's finding[20] to that effect is amply supported by the evidence.

Pacific, on the other hand, argues that the language of the section quoted by us in the last paragraph constitutes one integrated provision, that the words "bona fide" have reference to the amount of the loans and that "the only test of 'bona fide' is whether in fact the borrower received a principal sum of $5,000 or more." On this analysis, Pacific urges that the overriding condition imposed by section 22053—that such section shall not be used for the purpose of evading the Act—is directed toward a separate abuse, namely "the addition of charges or other amounts to make the loan equal or exceed $5,000" and thus not subject to the specified sections of the Act.

 "The fundamental rule of statutory construction is that the court should ascertain the intent of the Legislature so as to effectuate the purpose of the law." (*Select Base Materials, Inc.* v. *Board of Equalization* (1959) 51 Cal.2d 640, 645 [335 P.2d 672], and cases there cited; *East Bay Gar-*

---

[20]The trial court concluded: "That the transactions in which plaintiff delivered conditional sale contracts into the possession of defendant and defendant issued its checks to plaintiff were not sales of said contracts but were loans of money by defendant to plaintiff; said loans were not bona fide loans."

*bage Co.* v. *Washington Township Sanitation Co.* (1959) 52 Cal.2d 708, 713 [344 P.2d 289].) ■ In interpreting particular words, phrases or clauses in a statute, it is a cardinal rule that the entire substance of the statute or that portion relating to the subject under review should be examined in order to determine the scope and purpose of the provision containing such words, phrases, or clauses. (*Wallace* v. *Payne* (1925) 197 Cal. 539, 544 [241 P. 879].) The words in question "must be construed in context, keeping in mind the nature and obvious purpose of the statute . . . ." (*Johnstone* v. *Richardson* (1951) 103 Cal.App.2d 41, 46 [229 P.2d 9].)

■ In essence, section 22053 makes certain sections of the Act inapplicable to a special category of loans or to licensed personal property brokers in connection with such loans on the condition that section 22053 is not used for the purpose of evading the Act. The type of loan which thus becomes exempt from the specified restrictions and regulations of the Act and at the same time confers an immunity upon the broker connected with it is "any bona fide loan of a principal amount of five thousand dollars ($5,000) or more . . . ." We agree with Pacific that this is one unitary and composite description which defines the exempted category. It is not bifurcated so as to require a two-step process in its application—first determining whether a loan is bona fide and then whether the loan thus found bona fide is $5,000 or more or is less than $5,000. As we read the language in context it means a bona fide $5,000 (or more) loan—in other words a loan which in principal *amount* is just what it purports to be. Whether the loan transaction is in the form of a sale of contracts or other "paper" is irrelevant; the inquiry is directed to the transaction which is *in fact* a loan, no matter how it may be documented.

We find both judicial and legislative support for this construction of section 22053. In *Peoples Finance etc. Co.* v. *Mike-Ron Corp.* (1965) 236 Cal.App.2d 897 [46 Cal.Rptr. 497], section 18649 of the Industrial Loan Law (Fin. Code, §§ 18000-18947),[21] was in issue, a section differing from section 22053 only as to the minimal amount of the loan. The court, relying upon the Attorney General's construction of section 22053, held that a loan of $30,000 was exempt. The court said in pertinent part: "The court made a finding that there was no evasion. The defendants failed to present any testimony whatsoever of any evasion, which would be their duty. Here, the defendants *did receive at least $20,000 from the loan, which shows that the loan was bona fide.* [Par.] The excepted sections set forth in Financial Code section 18649 are: . . . [Par.] Thus, *all of these*

---

[21]Section 18649 provides: "The following sections of this division do not apply to any bona fide loan of a principal amount of ten thousand dollars ($10,000) or more or to an industrial loan company in connection with any such loan if the provisions of this section are not used for the purpose of evading this division."

*sections above mentioned are excluded under* section 18649 when the loan is a bona fide loan in excess of $10,000." (236 Cal.App.2d at p. 902.) (Italics added.)

The same section was considered in *Coronet Credit Corp.* v. *West Thrift Co.* (1944) 244 Cal.App.2d 631. The court there said "Secondly, the language of section 18649 makes it clear that this section does not exclude from its protective provisions any loan which, although made in the amount of $10,000 or more, violates some other section of division 7; rather it only excludes from its coverage loans which, although on their face are in excess of $10,000, are either *not bona fide,* i.e., *the money received by the borrower is actually less than the $10,000,* or are made in the amount of $10,000 or more for the purpose of evading the statutory provisions in division 7." (244 Cal.App.2d at p. 645; italics added.)

Pertinent here also is *Riebe* v. *Budget Financial Corp.* (1968) 264 Cal.App.2d 576 [70 Cal.Rptr. 654]. That case, dealing with section 22053, stated that "Section 22054, enacted in 1967, makes clear that the terms 'bona fide' and 'purpose of evading this division' used in section 22053 refer to the determination of the amount of the loan and not the character of the security given therefor. Section 22054 is consistent with a prior judicial interpretation of a provision similar to section 22053 contained in the Industrial Loan Law. (See *Peoples Finance & Thrift Co. of Beverly Hills* v. *Mike-Ron Corp., Inc.,* 236 Cal.App.2d 897 [46 Cal.Rptr. 497], interpreting § 18649.)" (264 Cal.App.2d at pp. 582-583.) (Fn. omitted; italics added.)

Section 22054, to which the court in *Riebe* referred, although added to the Act in 1967 and therefore after the loan transactions here involved, was expressly made "declaratory of existing law and not amendatory thereof."[22] While this expression by the Legislature is not binding upon

---

[22]Section 22054 provides: "In determining under Section 22053 whether a loan is a bona fide loan of a principal amount of five thousand dollars ($5,000) or more and whether the provisions of that section are used for the purpose of evading this division, the following principles apply:

(a) If a borrower applies for a loan in a principal amount of less than five thousand dollars ($5,000), and a loan to that borrower of a principal amount of five thousand dollars ($5,000) or more is made by a licensed personal property broker, and

(1) No adequate economic reason for the increase in the size of the loan exists, and

(2) By prearrangement or understanding between the borrower and the licensee a substantial payment is to be made upon the loan with the effect of reducing the principal amount of the loan to less than five thousand dollars ($5,000) within a short time after the making of the loan other than by reason of a requirement that the loan be paid in substantially equal periodical installments, then the loan shall not be deemed to be a bona fide loan of the principal amount of five thousand dollars ($5,000) or more and the provisions of Section 22053 shall be deemed to be used for the purpose

this court, nevertheless it "is a factor that may properly be considered in correctly determining the meaning and effect of the sentence in question. [Citations.] . . . The subsequent legislation interpreting the statute construed, does not change the meaning; it merely supplies an indication of the legislative intent which may be considered together with other factors in arriving at the true intent existing at the time the legislation was enacted." (*Stockton Sav. & Loan Bank* v. *Massanet* (1941) 18 Cal.2d 200, 204 [114 P.2d 592].) Having considered section 22054 together with other factors in our construction of that portion of section 22053 now engaging our attention we are satisfied that the term "bona fide" as used therein refers to the *amount* of the loan and not the *form* in which the loan is made.

The above interpretation of the provision in question appears to us to be supported by the general design of the Act and by its statutory history which we detailed in *Carter* v. *Seaboard Finance Co.* (1949) 33 Cal.2d 564, 574-586 [203 P.2d 758]. As we noted in *Carter* (at p. 582), the Interim Committee appointed by the Assembly in 1933 to investigate the business of commercial loans and to recommend legislation made its report to the Legislature in 1935.[23] The committee report clearly shows that the Legislature was concerned with the regulation of the small loan problem, not only in drafting the constitutional amendment of 1934[24] but in formulating legislation appropriate to the exercise of the grant of power conferred by the amendment.

---

of evading this division unless the loan complies with the provisions of this division relating to loans of less than five thousand dollars ($5,000).

(b) An individual advance of money of less than five thousand dollars ($5,000) pursuant to a revolving loan agreement or similar agreement between a borrower and a licensed personal property broker, or a loan agreement providing for the making of advances to the borrower from time to time up to an aggregate maximum amount, shall be deemed to be a loan of a principal amount of five thousand dollars ($5,000) or more if the total unpaid principal amount of all loans owing by the borrower to the licensed personal property broker at the time of any such advance is five thousand ($5,000) or more.

(c) If a loan made by a licensed personal property broker is in a principal amount of five thousand dollars ($5,000) or more, the fact that the transaction is in the form of a sale of accounts, chattel paper, contract rights, goods or instruments or a lease of goods shall not be deemed to affect the bona fides of the loan or the amount thereof or to indicate that the provisions of Section 22053 are used for the purpose of evading this division. As used herein, 'accounts,' 'chattel paper,' 'contract rights,' 'goods' and 'instruments' shall have the same meaning as in the Commercial Code. [Par.] This section shall be deemed declaratory of existing law and not amendatory thereof."

[23]See Report of the Assembly Interim Committee for the Investigation of Small Loans, published in the Assembly Journal, March 22, 1935, page 1297. (Committee Report.)

[24]In *Beneficial Loan Soc. Ltd.* v. *Haight* (1932) 215 Cal. 506 [11 P.2d 857], we held that the Legislature had no power to amend the General Usury Law, Deering's General Laws, Act. 3757, Statutes of 1919, page lxxxiii. Thereafter the Legislature submitted to the people a proposed constitutional amendment which became California

The recommendation of the Interim Committee was to classify the loans of personal property brokers into two categories—small loans subject to regulations and restrictions and large loans exempt from them.[25] The ensuing legislation carried out this small loan-large loan dichotomy first using the amount of $300[26] and then the amount of $5,000[27] as the line of demarcation. This legislative history makes clear that the exempting language found in section 22053 refers to the amount of the loan and not to its form, or, as West Pico argues, to its quality or character.

We, therefore, reject West Pico's construction of the "bona fide loan" provision of section 22053 and its contention grounded thereon that the transactions here in controversy cannot constitute bona fide loans of $5,000 or more because they were cast in the form of sales. Indeed it would seem that such a contention must fall before the language of subdivision (c) of section 22054 (see fn. 22, *ante*) which provides in substance that in determining whether a loan is a bona fide loan of a principal amount of $5,000 or more "the fact that the transaction is in the form of a sale of accounts, chattel paper, contract rights, goods or instruments . . . shall not be deemed to affect the bona fides of the loan or the amount thereof. . . ."

We now turn to consider whether the conditions of section 22053 have been met in the instant case. This requires us to decide first whether the loans here involved are bona fide loans in the amount of $5,000 or more. At the outset we reject Pacific's contention that the loan transactions

---

Constitution, article XX, section 22, which gave the Legislature the power to regulate interest rates for certain specifically exempted classes of lenders, including personal property brokers. The Personal Property Brokers Act of 1939 was passed pursuant to this specific grant of power.

[25]Committee Report, pages 1298, 1304-1306.

[26]See Personal Property Brokers Act of 1939 (Stats. 1939, ch. 952, p. 2667; Stats. 1939, ch. 1044, p. 2874; see *Carter* v. *Seaboard Finance Co., supra,* 33 Cal.2d at p. 583) providing for the regulation of loans made by personal property brokers in the amount of $300 or less. (See Stats. 1939, ch. 952, § 17, p. 2674; Stats. 1939, ch. 1044, §17, p. 2881.)

[27]See Stats. 1945, ch. 1220, § 1, p. 2321; Stats. 1945, ch. 1221, § 1, p. 2322, declaring that specified provisions of the Act "shall not apply to any bona fide loan of a principal amount of five thousand dollars ($5,000) or more, or to a duly licensed personal property broker in connection with any such loan, provided the provisions of this paragraph are not used for the purpose of evading this act. . . ." (Stats. 1945, ch. 1220, § 3(d), p. 2322; ch. 1221, § 3(d), p. 2323.) This last dividing line continued in force despite subsequent amendments (Stats. 1949, ch. 1033, §§ 2.1, 2.2, pp. 1917-1919; Stats. 1949, ch. 1034, § 1, p. 1927) until 1951, at which time the Act as *amended* became division 9, chapter 1, article 1 of the Financial Code (Stats. 1951, ch. 364, p. 1132). As we said in *Carter:* "The effect of an amendment to the act in 1945 was to relieve licensees from certain regulatory and penal provisions of the act on bona fide loans of $5,000 or more provided the amending section was not used for the purpose of evading the act." (*Carter* v. *Seaboard Finance Co., supra,* 33 Cal.2d 564, 586.)

constituted one loan in the amount of at least $2,971,505.15 which being obviously in excess of $5,000 was subject to no limit in the interest rate. There is no support in the record for such an assertion; nor does Pacific offer one. On the contrary the trial court found on substantial evidence that there was not *one* loan but many—"on numerous occasions" and that on each occasion "the amount thereof was the aggregate amount of the unpaid balances owing on the particular conditional sale contracts delivered by plaintiff to defendant, . . ." As we read the findings, they mean that there was a loan for each "bundle" of contracts transferred and assigned to Pacific. Indeed there is abundant evidence in the record clearly showing that according to the understanding of the parties loans would be made under the so-called master agreement of March 1954 only with reference to "bundles" of conditional sales contracts and that the amount of each cash advance would be determined by the discounted value of the respective "bundle."

An examination of the 371 loan transactions engaged in upon the delivery to Pacific of that number of "bundles" discloses that all advances except 45 are in amounts of $5,000 or more. As to the 45 loans for less than $5,000 the record practically compels the conclusion that as these 45 loans were made from time to time, the total unpaid principal amount of all loans owing by West Pico to Pacific at the time of any such advance was in excess of $5,000. In view of the March 1954 master agreement's provision for individual advances without limitation as to the amount of such advance, we think that it is an inescapable conclusion that each advance made by Pacific in amounts less than $5,000 were individual advances "pursuant to a revolving loan agreement or similar agreement" and must therefore be "deemed to be a loan of a principal amount of five thousand dollars or more . . . ." (§ 22054, subd. (b).) Indeed neither of the parties has directed our attention to any evidence in the record to the contrary. Nor does West Pico, in support of its claim that these loans were not bona fide, advance any reason other than that the loans were cast in the form of sales. As we have explained such fact does not preclude the loans from being bona fide loans in the amount of $5,000 or more and the trial court's finding that they were not bona fide is without support. We, therefore, conclude that as a matter of law each of the loan transactions was a bona fide loan of a principal amount of $5,000 or more.

This brings us to our second inquiry: whether each loan transaction satisfied the condition of section 22053, that the provisions of that section were not used for the purpose of evading the Act. West Pico's position on this phase of the issue seems unclear to us; it appears to be confined to the point that the section was used to evade the Act because the loans

were in the form of sales. As we have noted, this fact would not defeat the exemption provided by section 22053. (See § 22054, subd. (c).) West Pico urges no other basis of an evasion. While the trial court made no finding on this point, it stated in one of its memoranda of decision that "[t]here has been no evidence that the defendant has used the provisions of section 22053 for the purpose of evading" the Act. Our examination of the record confirms this. West Pico does not claim that there has been a failure to make a finding on a material issue; in any event it could not complain since the evidence is such that had a finding been made it would have been adverse to West Pico. (*Bowyer* v. *Burgess* (1960) 54 Cal.2d 97, 101 [4 Cal.Rptr. 521, 351 P.2d 793]; *Greenberg* v. *Hastie* (1962) 202 Cal.App.2d 159, 173-174 [20 Cal.Rptr. 747].)

We, therefore, conclude that, both conditions of section 22053 having been satisfied, the loans made by Pacific were exempt under that section and thus free of the various restrictions on interest and charges as therein provided.

However, West Pico argues that even if the conditions of section 22053 were met in the instant case so as to make that section operative, nevertheless section 22053 as it read at the times of these loans did not list section 22467 among the sections of the Act which it rendered inapplicable. It will be recalled that section 22053 specified 25 sections of the Act as inapplicable to bona fide loans of $5,000 or more; it did not specify section 22467 which was added to the list by a 1967 amendment. (See fn. 19, *ante,* and accompanying text.)[28] It will also be recalled that the trial court found that Pacific had also violated section 22467 by taking a power of attorney from West Pico (see fn. 13, *ante,* and accompanying text). The point of West Pico's present argument is that such violation of section 22467 made the loan transactions illegal, void and unenforceable by virtue of section 22652 which so provided where any provision of the Act was violated "in the making or collection of a loan." (See fn. 9, *ante,* and accompanying text.)

There is a short answer to West Pico's claim. Although section 22053 prior to 1967 did not exempt bona fide loans of $5,000 or more from the prohibitions of section 22467, it *did* expressly exempt them from all of the penalty provisions of the Act (§§ 22650, 22651, and 22652; see

---

[28]In view of our disposition of this issue, however, we need not reach either Pacific's argument that the amendment "wiped out" any cause of action for the violation of section 22467, or West Pico's reply that no such retroactive effect can be constitutionally given the amendment.

fns. 7, 8 and 9, *ante*)[29] except one, section 22653,[30] which makes violations of the Act a misdemeanor. Thus, contrary to West Pico's claim, a violation of section 22467, if any there was, does not render the loan transactions void or unenforceable or preclude Pacific from recovering on its cross-complaint.[31]

Since the loan transactions here involved were exempt by virtue of section 22053 from the restrictions on interest imposed by the Act, West Pico is not entitled to damages for usury, either by invoking common law remedies or statutory penalties.[32] Article XX, section 22 of the California Constitution provides that the "rate of interest upon the loan or forbearance of any money . . . shall be 7 per cent per annum but it shall be competent for the parties . . . to contract in writing for a rate of interest not exceeding 10 per cent per annum." However section 22 exempts from the above restrictions various institutions engaged in the business of lending money such as banks, building and loan associations, pawnbrokers and *personal property brokers.* (See art. XX, § 22, third par.) It has been for some time the settled law of this state, as set forth in a number of decisions of this court, that section 22 of article XX by exempting from its restrictions certain enumerated classes of persons, including personal property brokers, "operates to exempt those classes from the restrictions in the Usury Law. [Citations.]" (*Heald* v. *Friis-Hansen* (1959) 52 Cal.2d 834, 838 [345 P.2d 457]; *Carter* v. *Seaboard Finance Co., supra,* 33 Cal.2d 564, 582-583; *Wolf* v. *Pacific Southwest etc. Corp.* (1937) 10 Cal.2d 183, 184-185

---

[29]West Pico bases this argument on section 22652.

[30]Section 22653 provides: "Any person including the several members, officers, directors, agents, and employees of licensees, who violates or participates in the violation of any provision of the rules, orders, and regulations of the commissioner, or the provisions of this division is guilty of a misdemeanor."

[31]West Pico also contends that Pacific violated section 22468, as to which alleged violation the trial court made no finding. Even assuming that such a violation occurred, however, the express exemption from the penalty sections applicable to these transactions necessarily dictates the same result as stems from the alleged violation of section 22467.

[32]West Pico invokes, "[i]nsofar as not duplicatory or inconsistent" remedies under the Act, common law remedies for usury, and statutory penalties for usury. Under the first, it claims that it is entitled to recover from Pacific the value of all conditional sales contracts furnished the latter as well as all sums received in connection therewith by Pacific, less the principal sum of the loans actually made by Pacific to West Pico. Under the second, it claims it is entitled to recover all sums received by Pacific less the principal amounts of the loans made by Pacific to West Pico. Under the third, it claims treble the amount of all interest payments received by Pacific during the one-year period immediately preceding the commencement of the action. Nowhere, however, does West Pico contend that, in the event the loan transactions are found to be exempt under the Act, it is still entitled to recover according to common law and statutory remedies for usury. Rather, assuming that it has shown violations of the Act, West Pico argues that any penalty provided for in the Act is cumulative and in addition to the remedies for usury.

[74 P.2d 263]; *Penziner* v. *West American Finance Co.* (1937) 10 Cal.2d 160, 174, 177 [74 P.2d 252]; *Matulich* v. *Marlo Inv. Co.* (1936) 7 Cal.2d 374, 375-376 [60 P.2d 842].) As to these exempt classes, there are no restrictions on the rates of interest charged unless the Legislature so provides.

It must necessarily follow that the exemption of the enumerated classes from the restrictions of the Usury Law has at the same time made them immune to actions grounded upon common law remedies existing prior to the Usury Law. Any other result would frustrate the constitutional amendment which was designed to place in the hands of the Legislature the control of the charges to be made by the exempted groups. (See *Penziner* v. *West American Finance Co., supra,* 10 Cal.2d 160, 177.)

Finally, West Pico contends that Pacific is not entitled to the exemption afforded to a personal property broker by article XX, section 22 because the loans here involved were not secured by personal property whose use and possession was retained by other than the lender as required by section 22009. (For text of this section see fn. 2, *ante.*) The point of the argument is that the conditional sales contracts which were pledged to secure the loans were physically delivered to Pacific and hence not retained by other than the lender. The argument is specious and deserves little attention. A reading of section 22009 clearly shows that "personal property broker" means one engaged in the business of lending money and taking as security "any *contract* or obligation involving the forfeiture of rights in or to personal *property,* the use and possession *of which property* is retained by other than the mortgagee or lender, . . ." In the instant case it is obvious that each contract was delivered to the lender, Pacific, but the *personal property* covered by the contract, namely the *furniture,* was not but *was* retained by other than Pacific, namely West Pico's customer who purchased it.

We, therefore, conclude: that the loans made by Pacific involved here fall within the exemptive provisions of section 22053; that as a result they did not violate any of the sections of the Act specified by the trial court (except § 22467) including those sections prescribing maximum rates of interest; that the loans were not void and are not unenforceable; that a violation of section 22467, if any there was, did not render the loans void and does not make them unenforceable; and that since Pacific is a licensed personal property broker and a person exempted from the Usury Law under article XX, section 22, the loans were not usurious. As a result West Pico is not entitled to any relief and Pacific is entitled to relief on its cross-complaint.

Except for the reception of such evidence as the trial court may deem necessary or advisable in order to determine the amount, if any, of the indebtedness owing from West Pico to Pacific, we find nothing in the record

which impels us to order a new trial. The case was fully tried and, with the exception noted, there is no necessity to take further evidence. Any judgment to be entered should deny West Pico all recovery and award Pacific such relief to which it may be found entitled under the evidence. Under the circumstances it is appropriate to remand the cause with directions to the trial court to amend the findings of fact and conclusions of law in conformity with the views herein expressed and to enter judgment accordingly.

The judgment is reversed and the cause is remanded to the trial court to proceed with the disposition thereof under the directions and in conformity with the views herein expressed. Pacific shall recover its costs on appeal.

Burke, Acting C. J., Peters, J., Tobriner, J., Mosk, J., and Coughlin, J.,* concurred.

*Assigned by the Chairman of the Judicial Council.